**UNITED STATES of America,**
**Appellant,**

v.

**David J. BROWN and Liston Judge,**
**Appellees.**

**No. 7935.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 12, 1959.

Decided Jan. 4, 1960.

Mark R. Joelson, Atty., Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Julian T. Gaskill, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., on brief), for appellant.

No appearance and no brief for appellees.

Before SOPER and HAYNSWORTH, Circuit Judges, and THOMSEN, District Judge.

HAYNSWORTH, Circuit Judge.

In this action for civil penalties under the False Claims Act,[1] the District Court, influenced by the disparity between the amount of the mandatory penalty and the amount of the claims, entered judgment for the defendants upon the ground their claims were not presented directly to Commodity Credit Corporation. Under the scheme by which price supports are extended to tobacco, the farmers' claims of the support price are not filed immediately with Commodity, but that circumstance does not distinguish the case from comparable claims for the support price of other crops which, under prevailing procedures, are filed directly with Commodity.

The defendants, David J. Brown and Liston Judge, are small tobacco farmers in Duplin County, North Carolina.

Brown, for 1956, had a .79 acre tobacco allotment, but he had planted 1.32 acres, an excess of .53 acres. He did not dispose of his excess acreage, and was issued an excess marketing card. Under the Act and the applicable regulations,[2] Brown was required to market tobacco he harvested only under his excess card, without eligibility for price supports and subject to a penalty of 16¢ per pound.

Brown did market 408 pounds of his tobacco under his excess card for a gross price of $256.80 from which there was deducted a penalty of $65.28.

Liston Judge planted within his allotment and was issued a "within quota" marketing card, showing the general eligibility of the tobacco produced on his farm for price support and for marketing without penalty. Use of that card to market tobacco grown on another farm is prohibited.[3]

Using Judge's "within quota" card, the defendants on October 3, 1956 offered for sale at Ross Tobacco Warehouse No. 2, in Clinton, North Carolina, five baskets of tobacco which had been grown on Brown's farm and which could lawfully have been marketed only under Brown's excess card. One small basket was sold to a private purchaser for $21.-28. The bidding on the remaining four baskets did not reach the support level, and the auctioneer accordingly knocked them down to Flue-Cured Tobacco Cooperative Stabilization Corporation at the support prices, aggregating $302.86.[4]

We made reference to the mechanics by which price supports are extended to tobacco in Commodity Credit Corporation v. Worthington, 4 Cir., 263 F.2d 178. We need only briefly refer to such arrangements here.

It has long been the prevailing practice to market tobacco at auction sales at tobacco warehouses. The tobacco is graded and placed in baskets according to grade. The auctioneer as agent for the farmer[5] offers each basket successively and knocks it down to the highest bidder.

The Commodity Credit Corporation Charter Act as amended, particularly §§ 5(g) and 4(h),[6] requires Commodity to utilize existing and customary marketing channels and facilities wherever prac-

---

1. 31 U.S.C.A. § 231.

2. 7 U.S.C.A. § 1314.

3. 21 F.R. 3864–5, § 464.809.

4. 714 pounds of Brown's tobacco were marketed under Judge's card. This tobacco could have been sold lawfully, but Brown would have been required to ac-

cept the highest commercial bid and to pay a penalty of 16¢ a pound, or $114.24.

5. White v. Boyd, 124 N.C. 177, 32 S.E. 495; Hall v. Odom, 240 N.C. 66, 81 S.E. 2d 129; Turnage Co. v. Morton, 240 N.C. 94, 81 S.E.2d 135.

6. 15 U.S.C.A. 714c, 714b(h).

ticable, and by § 12 [7] it is authorized to utilize the services of cooperatives and producer associations.

Accordingly, Commodity adopted a regulation [8] that its tobacco price support program would be carried out in the field by producer associations under contracts with Commodity, that Commodity would authorize such associations to make advances to eligible producers directly or through auction warehouses, and that Commodity would make nonrecourse loans to the associations in an amount sufficient to cover the associations' advances and its expenses in executing the program.

In conformity with its regulation and its practice in prior years, for the 1956 crop year Commodity had entered into a contract with the Flue-Cured Tobacco Cooperative Stabilization Corporation authorizing and requiring the cooperative to extend advances to eligible producers in an amount equal to support prices whether or not the producers were members or stockholders of the cooperative. Under the contract, the cooperative was thereafter to protect and store the tobacco for Commodity and resell it. If cooperative's marketing operations, produced a profit for the year, one-half of the profit was to have been turned over to Commodity on account of its losses in prior crop years, but the remaining half of the profit was to have been distributed to the participating eligible producers. If, on the other hand, cooperative's marketing operations resulted in a loss for the year, the losses were to have been borne entirely by Commodity.

As contemplated by the contract between Commodity and the cooperative, the cooperative entered into contracts with warehouses under which cooperative obligated itself to make advances at support price levels to producers offering tobacco at that warehouse. In practice, if the highest commercial bid was lower than the support price, the tobacco was knocked down to the cooperative, which,

under the contract, was obligated to accept it and to advance the support price.

The contract between Commodity and the cooperative required that the cooperative's contracts with warehouses be approved by Commodity. The contract between the cooperative here and the Ross Warehouse was approved by Commodity.

Commodity had also arranged with Wachovia Bank and Trust Company to act for it as its fiscal agent in the disbursement of its moneys. The procedure, in practice, when tobacco was to be placed in the support program, was that the warehouse paid the producer and sent a settlement memorandum to the cooperative, upon receipt of which the cooperative reimbursed the warehouse and in return received reimbursement from the bank acting as Commodity's fiscal agent.

When Judge and Brown offered their ineligible tobacco under Judge's "within quota" card, they claimed the benefits of the price support program as to those baskets knocked down to the cooperative at the support prices. It was a claim by them of the support price, which, though not made immediately or formally to Commodity, was a claim against funds supplied by Commodity. Though the funds were being administered for Commodity by the cooperative, Commodity was the source of the only funds with which the claims could be paid. It is to be supposed that the defendants well understood their claims of the support price were against public funds of the United States, not against private funds of the cooperative.

This Court had at first taken the view that Commodity was not a department or officer of the Government within the meaning of the False Claims Act.[9] The Supreme Court reversed, holding that applications to Commodity for crop loans were claims against the United States within the contemplation of the False Claims Act. Rainwater v. United States, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d

---

7. 15 U.S.C.A. 714j.
8. 21 F.R. 3863 § 464.801.

9. United States v. McNinch, 4 Cir., 242 F.2d 359.

996; United States v. McNinch, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001.

 Whether the support program is executed through loans upon applications filed directly with Commodity or by an indirect arrangement appropriate to tobacco marketing practices appears to us of little consequence. In each instance the producer is applying for an advance of the support price well-knowing that it is to be paid by, or for the account of, Commodity. In each instance, the only funds at risk are public moneys. The particular arrangements by which Commodity adapts its operations to established marketing practices is not a basis for a distinction which would hold one false application for support prices to be within the False Claims Act and another, equally false, without. The arrangements in advance for the payment of such claims introduced appropriate indirection in the receipt and payment of the claim, but it did not thereby deprive Commodity's funds of need of protection or convert the claim into one against private funds.

That a fraudulently induced claim was within the reach of the False Claims Act notwithstanding the fact that the perpetrator of the fraud had no direct contractual relation with the Government or any governmental agency which was called upon to pay the claim was settled by United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443. In United States v. McNinch,[10] McNinch did not seek to avoid the forfeiture on the ground that his claim was not presented directly to the governmental agency. Such a position was taken by the defendant in United States v. Veneziale,[11] but the tendered defense was held unavailing upon the authority of United States ex rel. Marcus v. Hess. We reach the same conclusion.

 It was suggested in the District Court that if these claims were to be held subject to the civil penalties of the False Claims Act, the amount of the penalty should be reduced by the Court. While the amount of the penalty may seem large in comparison with the rather small gain the defendants realized by offering the tobacco under Judge's "within quota" card rather than Brown's excess card, Congress prescribed the penalty. Furthermore, as we recently held, indemnity is not the only measure of the reasonableness of the forfeiture. Toepleman v. United States, 4 Cir., 263 F.2d 697. Nor does a district court have discretionary power under Fed.Rules Civ. Proc. rule 60(b) (6), 28 U.S.C.A., to reduce or remit it. United States v. Cato Brothers, Inc., 4 Cir., 273 F.2d 153.

Reversed and remanded.

---

10. 4 Cir., 242 F.2d 359, affirmed as to the McNinch claim in 356 U.S. 595, 78 S. Ct. 950, 2 L.Ed.2d 1001.

11. 3 Cir., 268 F.2d 504.