. UNITED STATES of America,
Appellant,

v.

RIDGLEA STATE BANK et al.,
Appellees.

UNITED STATES of America,
Appellant,

v.

BANK OF COMMERCE et al.,
Appellees.

Nos. 21841, 21842.

United States Court of Appeals
Fifth Circuit.

March 14, 1966.

John C. Eldridge, Morton Hollander, Attys., Dept. of Justice, Washington, D. C., Stan McMurry, Asst. U. S. Atty., Fort Worth, Tex., John W. Douglas, Asst. Atty. Gen., Melvin M. Diggs, U. S. Atty., Barefoot Sanders, U. S. Atty., for appellant.

Loren Q. Hanson, Thompson, Walker Smith & Shannon, Forth Worth, Tex., for appellee Ridglea State Bank.

Chester G. Ball, Harris, Ball & Davis, Arlington, Tex., for appellee Bank of Commerce.

Before RIVES, BROWN and MOORE,* Circuit Judges.

MOORE, Circuit Judge:

In these cases the United States seeks to hold two banks, Ridglea State Bank (Ridglea) and Bank of Commerce (Commerce), liable under the False Claims Act [1] for the dishonesty of a former employee of both banks. The trial court held neither bank liable. We affirm in part and reverse and remand in part.

The cases arise as the result of fraudulent conduct by Jack Donald Hubbard, assisted by certain confederates. Hubbard served as executive vice president of Ridglea from December 1, 1950, through February 7, 1955, and as president of Commerce from February 8, 1955, to June 7, 1956. While at Ridglea, Hubbard approved four applications of David Garrett for Federal Housing Authority (FHA) insured loans, although Hubbard was aware that material representations in at least one of the applications—the one for the Windy Hill Antique Shop—were false and fraudulent. Hubbard personally received some of the proceeds of the loans to Garrett. Each of the four loans was defaulted. On August 21, 1956—after Hubbard had stopped working for Ridglea—Ridglea applied to the FHA for reimbursement of its losses. The FHA refused to pay three of the four claims because it had received information from the FBI about the fraudulent activities of Garrett and Hubbard. The FHA paid the fourth claim for $1,677.91, which arose out of the loan which purported to be to the Windy Hill Antique Shop, but several years later notified Ridglea that the note accompanying the claim was a forgery, and requested that it repurchase the claim. Ridglea did so, paying the FHA $1,677.91, and the FHA sent the claim form back to Ridglea with a letter indicating that the claim was cancelled.

After moving to the Bank of Commerce, Hubbard approved four more applications—two by Garrett, two by one Theodore Wischkaemper—for FHA-insured loans, although Hubbard knew that all four applications were false in material respects. The loans made on the strength of these applications were defaulted. On November 19 and 20, 1956—after Hubbard had ceased to work for Commerce—Commerce applied to the FHA for reimbursement of its losses on

---

* Of the Second Circuit, sitting by designation.

1. Rev.Stat. §§ 3490, 5438 (2d ed. 1878). Read together, the two sections provide in pertinent part that:
   "Every person * * * who makes or causes to be made, or presents or causes to be presented, for payment or approval, * * * any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, * * *." (§ 5438) * * * "shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of doing or committing such act together with the costs of suit * * *." (§ 3490).

all four loans. The FHA paid all four claims, although upon subsequent FHA request, Commerce repurchased two of the claims, paying for them the full amount which the FHA originally had paid as reimbursement.

In the summer of 1957 Hubbard and Garrett were indicted, Hubbard for making fraudulent loans and Garrett for obtaining money under false pretenses. Both were convicted upon pleas of guilty.

In 1962 the United States brought two actions under the False Claims Act, one against Hubbard and Ridglea, one against Hubbard, Wischkaemper, and Commerce. The district court, sitting without a jury, held for the United States as against Hubbard and Wischkaemper on all of the counts of both complaints which went to trial. However, the court dismissed so much of the complaint against Hubbard and Ridglea as involved the three claims for reimbursement which the FHA had refused to pay. The court gave judgment for both defendant banks on all of the counts which went to trial, primarily on the grounds that Hubbard's fraud could not properly be imputed to the banks.

The United States appeals from the order of dismissal in favor of Hubbard and Ridglea and from the final judgments in favor of both banks. The two actions were consolidated for purposes of appeal.

## I. The Order of Dismissal.

The trial court dismissed for failure to state a cause of action that part of the complaint against Hubbard and Ridglea which concerned claims for reimbursement which were denied by the FHA before any money was paid out.

■ We think that the trial court was mistaken in its apparent belief that no cause of action is stated under the False Claims Act if the Government has not paid money on the false claim. The Supreme Court in United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), affirmed the opinion of a trial court which had held in part that a forfeiture could be recov-

ered under the False Claims Act even where the Government had discovered the fraud before it paid the false claim. 41 F.Supp. 197, 218 (W.D.Pa.1941). A footnote in Rex Trailer Co. v. United States, 350 U.S. 148, 153 n. 5, 76 S.Ct. 219, 100 L.Ed. 149 (1956) makes clear that the Supreme Court was fully aware of this aspect of the Marcus case. See United States v. Rohleder, 157 F.2d 126 (3d Cir. 1946) and United States v. Fox Lake State Bank, 225 F.Supp. 723 (N.D. Ill.1963), both of which hold that proof of actual damage is not a prerequisite to the recovery of a forfeiture under the False Claims Act. See also Toepleman v. United States, 263 F.2d 697, 699 (4th Cir. 1957), cert. denied sub nom. Cato v. United States, 359 U.S. 989, 79 S.Ct. 1119, 3 L.Ed.2d 978 (1959), which points out that the investigation necessary to detect a false claim costs the Government money even if no money is paid on the claim.

Nor does United States v. McNinch, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1956), on which the defendants and the trial court rely, change the validity of the earlier pronouncements by the Supreme Court. McNinch holds only that where a bank seeks FHA insurance coverage for a loan based upon a fraudulent application, this is not a "claim" within the meaning of the False Claims Act. We are dealing with an application for reimbursement under an FHA insurance policy, not with the initial request for insurance coverage. The former is a claim for the payment of money, which, as the McNinch case indicates, is exactly what is meant by the word "claim" in the False Claims Act.

We conclude that the trial court erred in its order of dismissal, and we remand for trial on the merits that part of the complaint against Hubbard and Ridglea which was dismissed below.

## II. The Imputation of Hubbard's Fraud to the Banks.

The False Claims Act renders liable to forfeitures and double damages anyone who submits a false claim to the Government "knowing such claim to be false,

fictitious, or fraudulent * * *." The Government does not dispute the finding by the trial court that as to all claims for reimbursement submitted to the FHA by Commerce and as to the claims submitted by Ridglea which the FHA did not reject in the first instance, none of the employees in either bank except Hubbard had actual knowledge of the falsity of the documents which accompanied the claims. The Government's case rests on imputing to the banks Hubbard's knowledge of the falsity of the documents, on the theory that he was acting as the agent of the banks at the time he approved the loans.

■ It is true that Hubbard was no longer in the employ of the banks at the time the claims for reimbursement were submitted to the FHA. However, an agent's knowledge, if otherwise properly imputable to his principal, will continue to be imputed to the principal even after the termination of the agent's employment. Restatement (Second), Agency, § 275, comment e, § 278, comment b (1958). See Gill v. Richmond Co-op Ass'n, 309 Mass. 73, 34 N.E.2d 509 (1941); Lawson v. Board of Comm'rs, 144 Kan. 450, 61 P.2d 1365 (1936); New England Trust Co. v. Bright, 274 Mass. 407, 174 N.E. 469, 73 A.L.R. 416 (1931). The real question is whether Hubbard's knowledge of the fraudulent nature of the loan applications should be imputed to his employer banks in the first place; not whether that imputation can survive the termination of Hubbard's employment.

■ The Government points to a variety of cases, civil and criminal, in which the knowledge or guilty intent of employees has been imputed to corporations in order to hold them liable for fraudulent or criminal activity on the part of their employees. Almost all of the criminal cases cited by the Government are distinguishable from the case before us, since in each of them the intention of the agent was to benefit his principal by his criminal activity. E. g., 281 F.2d 137 (6th Cir. 1960) (price-fix-Continental Baking Co. v. United States,

ing); United States v. Armour & Co., 168 F.2d 342 (3d Cir. 1948) (tie-in sales); C. I. T. Corp. v. United States, 150 F.2d 85 (9th Cir. 1945) (intent to increase interest income). *But* cf. Old Monastery Co. v. United States, 147 F.2d 905 (4th Cir.), cert. denied, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 437 (1945). The general rule is that if a specific criminal intent is necessary to constitute a crime, an employer may be penalized for an employee's criminal act only if the agent acted within the scope of his employment, and not if the agent acted for some purpose other than that of serving his employer. Restatement (Second), Agency § 217D, comment d, and § 235 (1958). As we said in Standard Oil Co. of Tex. v. United States, 307 F.2d 120, 129 (5th Cir. 1962):

> "Under a statute requiring that there be 'a specific wrongful intent,' * * * the corporation does not acquire that knowledge or possess the requisite 'state of mind essential for responsibility,' through the activities of unfaithful servants whose conduct was undertaken to advance the interests of parties other than their corporate employer."

In the present case, Hubbard's purpose was most certainly not to benefit his employer banks. He must have known that the loans he approved would be defaulted, so that the banks would not make any money on interest on the loans. And, as the trial court found, Hubbard's approval of fraudulent applications for FHA-insured loans endangered the bank's ability to continue to handle FHA business and jeopardized the reputation of the banks and their financial integrity. Hubbard's purpose, in fact, was to line his own pockets and those of his accomplices with the proceeds of the loans and to get money to make payments on loans previously approved by him on the basis of fraudulent applications, so that these earlier wrongdoings would remain concealed.

The Government urges, however, that its case against the banks is a civil rather than a criminal one and points out

that in most civil cases the employer is held liable for the fraudulent misrepresentations of his agent, even though the agent acted without any intent to benefit his employer, so long as the third person reasonably believed that the agent was acting within the scope of his employment. E. g., Gleason v. Seaboard Air Line R'y, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929) (railroad held liable when its employee misrepresented to a factor that goods had arrived, in order to induce the factor to honor a draft forged by the employee); Rutherford v. Rideout Bank, 11 Cal.2d 479, 80 P.2d 978, 117 A.L.R. 383 (1938) (bank held liable for fraudulent misrepresentations by bank manager designed to benefit the manager and not the bank); Restatement (Second), Agency § 257 and comment *d*; Mechem, Outlines of the Law of Agency §§ 131–35 (4th ed. 1952). All of these authorities concern civil actions to recover actual loss caused by the misrepresentations of an employee; not, as here, actions to recover forfeitures and double damages far in excess of actual loss.

We find ourselves confronted with two rules on the imputation of an agent's fraudulent intent to his employer, and a case which falls somewhere between the usual areas of operation of the two rules. We can determine which rule should apply only by attempting to understand the reasons for the difference between the two rules.

■ In a civil action to recover actual damages for an agent's misrepresentation done without intent to benefit his employer, liability is imposed upon the employer not only because the third party reasonably thought that the agent was acting for the employer, see McCord v. Western Union Telegraph Co., 39 Minn. 181, 39 N.W. 315 (1888), and perhaps because the imposition of liability will encourage more careful supervision of employees by employers, see Morris, The Torts of an Independent Contractor, 29 Ill.L.Rev. 339, 341 (1934), but also because the third person has suffered loss which the employer is better able to bear and to spread than is his agent, see

Gleason v. Seaboard Air Line R'y, supra. This last reason has been called "the real reason for employers' liability." Baty, Vicarious Liability 154 (1916).

In criminal cases in which a specific intent on the part of an employee acting without intent to benefit his employer is sought to be imputed to the employer, the relief requested is not restitution for a specific loss inflicted on an innocent third party and the policy of fair loss allocation is not present. Furthermore, the possibility of criminal punishment serves as a deterrent to employees who, for lack of assets, may not be deterred by the prospect of civil liability.

In the case before us, the Government is seeking much more than the recovery of an out-of-pocket loss caused by the fraudulent activities of an employee of the defendant banks. Of the eight claims for reimbursement in question, only two (totalling $2,038.62) were paid by the FHA and not repurchased by the banks. The Government is asking for a total of $23,591.14—the statutory forfeiture of $2,000 for each false claim, even if never paid by the FHA, or paid and later repurchased; plus double damages for the claims paid; less the amounts paid by the banks to repurchase claims which they had been told were irregular.

We should note that, as the False Claims Act is written, the $2,000 forfeiture is not something ancillary or discretionary, to be tacked on in addition to actual damages when the trier of fact finds the false claim to have been particularly heinous. The statutory framework is quite the opposite: the false claimant "shall forfeit and pay to the United States the sum of two thousand dollars and, *in addition,* double the amount of damages which the United States may have sustained * * *." (emphasis added). It is not surprising, in light of the language of the statute, that the forfeiture amount has been held to be mandatory and beyond the power of the courts to modify no matter how disproportionate the forfeiture may seem in relation to the actual damage suffered by the Government. United States v.

Brown, 274 F.2d 107 (4th Cir. 1960); United States v. Cato Brothers, Inc., 273 F.2d 153 (4th Cir. 1959).

It is of little relevancy that other courts in other contexts have characterized the forfeiture and double damage provisions of the False Claims Act as "penal" or "civil". See United States ex rel. Marcus v. Hess, 317 U.S. 537, 549, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (action for forfeiture and double damages is "remedial" and, therefore, does not constitute double jeopardy after a criminal conviction under the Act); Hyslop v. United States, 261 F.2d 786, 792 (8th Cir. 1958) (since forfeiture may be awarded even in the absence of actual damage, the forfeiture provision is penal and must be strictly construed); United States v. Gable, 217 F.Supp. 82 (D.Conn. 1963) (action for forfeiture and double damages is civil, not penal, and hence survives the death of the wrongdoer).

■ What is important for the proper decision of this case is that the present action is not primarily one for the recovery of a loss caused by an employee, but is one which, if successful, must result in a recovery wholly out of proportion to actual loss. It is also important that criminal sanctions against the wrongdoing employees exist (witness the convictions of Garrett and Hubbard), which will tend to deter the repetition of their conduct insofar as deterrence of fraud is possible. Because of these factors, the case differs basically from the ordinary civil case in which the intent of a self-serving employee is imputed to his employer. Instead, the case calls for the application of the rule which we discussed in Standard Oil Co. of Tex. v. United States, 307 F.2d 120 (5th Cir. 1962); that is, that the knowledge or guilty intent of an agent not acting with a purpose to benefit his employer, will not be imputed to the employer, when the latter is sought to be held liable under a statute requiring knowledge or guilty intent.

We therefore affirm the judgments below for the defendant banks as to those portions of the two complaints which went to trial. However, our conclusion that Hubbard's fraud cannot be imputed to the banks does not alter the need to remand that part of the complaint against Ridglea which the trial court erroneously dismissed, since the trial court did not decide whether any employees of Ridglea other than Hubbard knew of the falsity of the documents accompanying the claims for reimbursement which the FHA rejected.

Affirmed in part and reversed and remanded in part.