# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 19, 2013

Lyle W. Cayce
Clerk

No. 12-40447

United States of America, ex rel., DAVID R. VAVRA, et al.,

Plaintiffs

UNITED STATES OF AMERICA,

Intervenor - Appellant

v.

KELLOGG BROWN & ROOT, INCORPORATED,

Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before JOLLY, BENAVIDES, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

   We are asked to decide a question of first impression in interpreting the Anti-Kickback Act (the "AKA" or the "Act"), 41 U.S.C. §§ 51-58.[1] At issue is whether, and if so under what conditions, 41 U.S.C. § 55(a)(1)'s civil suit

---

[1] As the parties both note, after this litigation commenced, Congress re-codified the AKA without substantive change, placing it at 41 U.S.C. §§ 8701-07. *See* Public Contracts—Enact Certain Laws, Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3838-41 (2011). Because the parties and the district court all continue to cite the prior-labeled statutory sections of the Act, we maintain that convention.

No. 12-40447

provision extends vicarious liability to an employer for the acts of its employees. Employees of Defendant-Appellee Kellogg Brown & Root, Inc. ("KBR") allegedly accepted kickbacks from two companies angling to win subcontracts on KBR's prime contract to service American armed forces in military theaters across the globe. Intervenor-Appellant, the United States, wishes to hold KBR liable for the kickbacks.

For the reasons outlined below, we conclude the district court erred in finding that § 55(a)(1) does not allow the government to allege vicarious liability. We REVERSE its ruling granting KBR's motion to dismiss the government's AKA claim under Federal Rule of Civil Procedure 12(b)(6) and REMAND for further proceedings.

## FACTS AND PROCEEDINGS[2]

In 2001, KBR secured a contract to provide global logistical services to the United States Army, an agreement known as Logistics Civil Augmentation Program III ("LOGCAP III"). LOGCAP III was structured as an "indefinite delivery/indefinite quantity contract," under which the Army issues KBR discrete task orders that KBR may fulfill on its own or by retaining subcontractors. KBR periodically bills the Army for the costs of performing the task orders, including costs incurred by its subcontractors, and is also permitted to charge the Army mark ups of one percent as profit and an award fee of up to two percent. KBR engaged two subcontractors, EGL, Inc. ("EGL") and Panalpina, Inc. ("Panalpina") to assist in carrying out LOGCAP III task orders to transport military equipment and supplies to Iraq, Afghanistan, and Kuwait between 2002 and 2006.

---

[2] As this case reaches the court on the district court's grant of a motion to dismiss, we accept the well-pleaded facts from the government's complaint as true. *See SEC v. Cuban*, 620 F.3d 551, 553 (5th Cir. 2010).

No. 12-40447

As the government alleges, employees in KBR's transportation department accepted kickbacks from counterparts in EGL and Panalpina calculated to "obtain favorable treatment on . . . subcontracts with KBR, such as overlooking service failures and continuing to award new subcontracts . . . despite such failures." The allegations center on KBR's Corporate Traffic Supervisor for LOGCAP III, Robert Bennett. Bennett was responsible for overseeing EGL's and Panalpina's performances on LOGCAP III subcontracts and for reviewing the invoices those subcontractors billed KBR for their services. From 2002 to 2006, Bennett and four colleagues in the KBR transportation department accepted kickbacks from Kevin Smoot, managing director of EGL's freight forwarding station, as well as other EGL employees acting on Smoot's instructions, on at least ninety-three occasions. The benefits ranged from "meals, drinks, golf outings, tickets to rodeo events, baseball games, football games, and other gifts and entertainment." Between 2003 and 2006, Panalpina's account representative for the LOGCAP III subcontracts, Grant Wattman, and other Panalpina employees acting at Wattman's behest, provided Bennett and KBR colleagues kickbacks on fifty-five occasions in the form of "meals, drinks, golf outings, and other gifts and entertainment."[3]

This civil action commenced when two private individuals brought a *qui tam* suit against KBR, Bennett, and others for the kickback scheme. The government intervened in the case against KBR and filed its own complaint. KBR moved to dismiss the government's complaint. As relevant to the present appeal, KBR argued the government failed to state a claim for civil liability under the AKA, because 41 U.S.C. § 55(a)(1) does not permit vicarious liability. In the alternative, it contended the complaint failed to allege sufficient facts to attribute Bennett's and his transportation department colleagues' conduct to

---

[3] Bennett and Smoot subsequently pleaded guilty to federal criminal charges related to the kickbacks that were brought under the AKA's criminal provision, 41 U.S.C. § 54.

3

No. 12-40447

KBR. The district court granted the motion to dismiss the AKA count for failure to state a claim, finding that "the plain language of § 55(a) indicates that corporate vicarious liability" does not extend to violations of § 55(a)(1). It further noted that "[b]ecause the United States has not sufficiently alleged that KBR employees were acting for the corporation's benefit, imputation [of vicarious liability] is not appropriate in this case."

To obtain final judgment, the government voluntarily dismissed all of its remaining claims and filed the present appeal. The government solely challenges the district court's ruling on the AKA count.

## STANDARD OF REVIEW

We review the district court's decision to grant a motion to dismiss de novo. *United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 872 (5th Cir. 2008). We "accept 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Cuban*, 620 F.3d at 553 (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted).

## DISCUSSION

We begin with a brief description of the relevant provisions of the AKA, before reaching the two merits issues raised on appeal: whether § 55(a)(1) provides for vicarious liability, and, if it does, whether the government sufficiently imputes liability to KBR in its complaint.

### A.    The Anti-Kickback Act's Civil Liability Provisions

"In the idiom of economic crime, a 'kickback' is a kind of commercial bribe." *United States v. Purdy*, 144 F.3d 241, 242 (2d Cir. 1998). Congress enacted the AKA in 1946, responding to reports revealing that World War II defense

4

subcontractors paid fees to prime contractors to gain valuable military subcontracts. *Id.* at 242-43; *see* S. REP. NO. 99-435, at 3 (1986). The taxpayer typically bore the cost of the fees, as prime contractors charged the government subcontract costs inflated by the amount of such "kickbacks." *See United States v. Acme Process Equip. Co.*, 385 U.S. 138, 143 (1966); *Purdy*, 144 F.3d at 242-43.

The AKA presently defines a "kickback" as:

> any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract[4] or a subcontract[5] relating to a prime contract.

41 U.S.C. § 52(2). It states that:

> A person may not—
> (1) provide, attempt to provide, or offer to provide a kickback;
> (2) solicit, accept, or attempt to accept a kickback; or
> (3) include the amount of a kickback prohibited by paragraph (1)
> or (2) in the contract price—
>> (A) a subcontractor charges a prime contractor or a higher tier subcontractor; or
>> (B) a prime contractor charges the Federal Government.

§ 53. The AKA defines "person" to include both an "individual" and "a corporation, partnership, business association of any kind, trust, [or] joint-stock company." § 52(3). As the district court found, the parties do not dispute, at least for purposes of the motion to dismiss, that the benefits provided to Bennett and other KBR employees were kickbacks given to prime contractor employees by subcontractor employees.

---

[4] A "prime contract" is "a contract or contractual action entered into by the Federal Government to obtain supplies, materials, equipment, or services of any kind." 41 U.S.C. § 52(4).

[5] A "subcontract" is defined as "a contract or contractual action entered into by a prime contractor or subcontractor to obtain supplies, materials, equipment, or services of any kind under a prime contract." 41 U.S.C. § 52(7).

No. 12-40447

The case turns on interpreting the civil liability provisions of the AKA, codified at 41 U.S.C. § 55(a).  Section 55(a), "Civil Actions," provides:

> (a) Amount.— The Federal Government in a civil action may recover from a person—
>
> (1) that knowingly engages in conduct prohibited by section [53] of this title a civil penalty equal to—
>> (A) twice the amount of each kickback involved in the violation; and
>> (B) not more than $[11,000][6] for each occurrence of prohibited conduct; and
>
> (2) whose employee, subcontractor, or subcontractor employee violates section [53] of this title by providing, accepting, or charging a kickback a civil penalty equal to the amount of that kickback.

41 U.S.C. § 55(a).  Section 55(a)'s present civil liability provisions are the product of the Anti-Kickback Enforcement Act of 1986, a series of amendments intended "to strengthen the prohibition of kickbacks relating to subcontrac[ts] under Federal Government contracts."  Pub. L. No. 99-634, 100 Stat. 3523.  Previously, the government could recover only the value of a kickback and could obtain relief only from the kickback's recipient or the subcontractor who provided it.  *See* 41 U.S.C. § 51 (1982).  The 1986 amendments reshaped the civil damages remedies by permitting, in § 55(a)(1), recovery of double damages and per-occurrence penalties from knowing violators of the Act.  *See* Pub. L. No. 99-634, § 5, 100 Stat. 3523; H.R. REP. NO. 99-964, at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5960, 5967.[7]  In § 55(a)(2), the 1986 amendments added recovery of the cost of

---

[6] Acting under the authority of the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (2006), the Department of Justice increased the amount of the penalty in § 55(a)(1)(B) from $10,000, its original statutory amount, to $11,000. 28 C.F.R. § 85.3(a)(13).

[7] For ease of reference, we label § 55(a)(1)(A) the "double damages penalty," as it permits recovery of twice the kickback amount.  *See* § 55(a)(1)(A).  We call § 55(a)(1)(B) the "per-occurrence penalty," under which the government also may secure up to $11,000 for each violation.  *See* § 55(a)(1)(B).

6

the kickback from prime contractors and higher tier subcontractors for kickback activity on the part of their employees or subcontractors. *See* Pub. L. No. 99-634, § 5, 100 Stat. 3523; H.R. REP. NO. 99-964, at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5960, 5967. The government, in this case, only alleges a violation of § 55(a)(1).

## B.    Whether § 55(a)(1) Permits Holding Employers Vicariously Liable

We turn to whether the government may ever bring a suit under § 55(a)(1) alleging an employer is vicariously liable for the kickback-related conduct of its employees.[8] When interpreting a statute, our analysis begins with its text. *See In re Amy Unknown*, 701 F.3d 749, 759-60 (5th Cir. 2012) (en banc). The district court reasoned primarily from the text and structure of § 55(a), arguing that to provide for vicarious liability under § 55(a)(1) "would render Congress's reference to fraud committed by an 'employee, subcontractor, or subcontractor employee,' which appears only in § 55(a)(2), superfluous." It stated that if the government could pursue employers under § 55(a)(1), with its double damages and per-occurrence penalty provisions, § 55(a)(2) would lose its relevance because it provides for recovery of the value of the kickback only. Under the district court's approach, Congress contemplated that persons would be held liable for their employees and subcontractors under subsection (a)(2) but not under (a)(1).

The district court's reading gives individual expression to both subsections (a)(1) and (a)(2), but it insufficiently accounts for the fact that both of § 55(a)'s subsections allow the government to "recover from a *person*." *See* § 55(a) (emphasis added). Congress defined "person" broadly in the AKA, to include

---

[8] On appeal, KBR does not dispute that § 55(a)(1) allows vicarious liability under some circumstances. It has waived, therefore, any argument that the provision does not permit imputing vicarious liability. *See Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008). Nonetheless, we address the issue out of an abundance of caution and to give attention to the district court's holding, as well as because it is a prerequisite to reaching the terrain the parties do contest, the circumstances under which § 55(a)(1) vicarious liability may arise.

corporations and other business entities.  41 U.S.C. § 52(3); *see also Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 782 (2000) ("the presumption with regard to corporations is . . . they are presumptively *covered* by the term 'person'") (citing the Dictionary Act, 1 U.S.C. § 1).  By § 55(a)'s plain terms, a corporate person, and not solely its individual employees, can be held liable under both subsections (a)(1) and (a)(2).  *See Kellogg Brown & Root Servs., Inc. v. United States* (*KBR I*), 99 Fed. Cl. 488, 504 (2011).  Furthermore, when Congress creates causes of action in tort, we must assume "it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  It is well-established that "[a] corporation is only a legal entity and strictly speaking it cannot act or have a mental state by itself. Nevertheless, the acts and mental states of its agents and employees will be imputed to the corporation where such natural persons acted on behalf of the corporation."  10 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 4877 (2012 ed.) (internal citations omitted).  Since Section 55(a)(1) makes corporations liable for kickback activity, it requires attributing liability to corporate entities for that activity under a rule of vicarious liability.

Congress's decision to provide for vicarious liability under both subsections does not render § 55(a)(2) superfluous.  Under § 55(a)(1), the government must prove a "knowing[]" violation before it may obtain double damages and per-occurrence recoveries.  *See* § 55(a)(1).  Section 55(a)(2) requires no proof of "knowing" misconduct before allowing recovery of "a civil penalty equal to the amount of th[e] kickback." *See* § 55(a)(2).  Like the Court of Federal Claims, we find "[i]t is entirely consistent for the statute to punish knowing violations more severely than those of which the corporation was unaware." *See Kellogg Brown & Root Servs., Inc. v. United States* (*KBR II*), 103 Fed. Cl. 714, 773 (2012).  We

conclude that § 55(a)(1) permits the government to attribute liability to corporate defendants vicariously.[9]

We add that we appreciate Judge Jolly's separate effort, in concurrence, to explore the distinction between the "knowing[]" violations contemplated in § 55(a)(1) and those acts encompassed by § 55(a)(2). We are mindful, however, that this issue of statutory interpretation was neither squarely presented to us by the parties on appeal, nor relied upon by the district court. We respectfully decline to reach the question, unnecessary as it is to our holding, on our own initiative. Even consistent with Judge Jolly's approach to the text, as he admits, defining what "knowingly" entails in the context of the AKA is a nuanced, fact-reliant question unsuited for resolution at the motion to dismiss stage. *See In re Hellenic Inc.*, 252 F.3d 391, 395 & n.20 (5th Cir. 2001); *see also United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977) (holding, in the False Claims Act context, that "liability of a corporation . . . may arise from the conduct of employees other than those with 'substantial authority and broad responsibility.'"). Lacking development of the record, we emphasize that we make no determination as to the knowledge requirement of this statute, pleaded by the government in its complaint.

**C.     Whether the Complaint Sufficiently Alleges Vicarious Liability**

We next reach KBR's challenge to whether the government pleaded facts sufficient to hold KBR liable for the conduct of its employees. When grappling with the standard for imposing vicarious liability in civil liability provisions, we look to the common law principles distilled in the Restatement (Second) of Agency for guidance. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 542 (1999); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.* (*ASME*), 456 U.S. 556, 565-66 & n.5 (1982); *United States v. Ridglea State Bank*, 357 F.2d 495, 498-500 (5th

---

[9] The statutory text yields a clear result, so we need not examine the legislative history on which the government also relies. *See In re Amy Unknown*, 701 F.3d at 760.

Cir. 1966). Under the default, common law rule of vicarious liability, "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment,"[10] or, if the act is committed outside the scope of employment, if "the servant purported to act or to speak on behalf of the principal and there was reliance upon *apparent authority*, or he was aided in accomplishing the tort by the existence of the agency relation." RESTATEMENT (SECOND) OF AGENCY § 219 (1958) (emphasis added); *accord ASME*, 456 U.S. at 565-67; *see also In re Hellenic Inc.*, 252 F.3d at 395. The government, for its part, neither avers in its complaint nor advances on appeal that the KBR officials accepting bribes did so within the scope of their employment. The government instead argues the KBR officials acted within their apparent authority. "'Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.'" *ASME*, 456 U.S. at 566 n.5 (quoting RESTATEMENT (SECOND) OF AGENCY § 8 (1958)). As the Supreme Court has further explained, "one who appears to have authority to make statements for the [principal] gives to his statements the weight of the [principal's] reputation." *Id.* at 567 (internal quotation marks omitted).

---

[10] The Restatement further defines the term "scope of employment," providing that:
(1) Conduct of a servant is within the scope of employment if, but only if:
    (a) it is of the kind he is employed to perform;
    (b) it occurs substantially within the authorized time and space limits;
    (c) it is actuated, at least in part, by a purpose to serve the master, and
    (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.
RESTATEMENT (SECOND) OF AGENCY § 228 (1958).

No. 12-40447

KBR's challenge is that the AKA's language and structure indicate congressional intent to deviate from the default rule and require the government to plead, and later to prove, a narrower theory of vicarious liability than apparent authority. KBR urges principally that the government must allege KBR employees acted with an intent to benefit KBR and were of managerial level acting within the scope of their employment, before the government may state a claim imputing liability to KBR. We disagree, not being persuaded judicially to interpret this statute to apply restrictive notions of vicarious liability.

Specifically, and starting with the intent-to-benefit requirement, the district court buttressed its decision to grant the motion to dismiss by noting that the government could not, in any event, impute vicarious liability to KBR for "knowingly" violating § 55(a)(1) because it had "not sufficiently alleged that KBR employees were acting for the corporation's benefit." The district court relied on our decision in *Ridglea*, 357 F.2d 495, for the act-to-benefit standard, and KBR does the same on appeal.

In *Ridglea*, the government sought to hold two banks liable under the False Claims Act ("FCA") for the conduct of a former employee who knowingly approved false and fraudulent Federal Housing Authority loan applications while working at the banks. 357 F.2d at 496. The version of the FCA in effect at the time gave the government the right to recover, for knowing violations of the law, double damages and a forfeiture of $2000 for each false claim. *See id.* at 499. In deciding whether the banks could be held liable, we noted the government's reliance on case law establishing "that in most civil cases the employer is held liable for the fraudulent misrepresentations of his agent, even though the agent acted without any intent to benefit his employer, so long as the third person reasonably believed that the agent was acting within the scope of his employment." *Id.* at 499. We distinguished the case before us, however,

11

reasoning: "All of these authorities concern civil actions to recover actual loss caused by the misrepresentations of an employee; not, as here, actions to recover forfeitures and double damages far in excess of actual loss." *Id.*

We focused particularly on the FCA's $2000 forfeiture provision, which "ha[d] been held to be mandatory and beyond the power of the courts to modify no matter how disproportionate the forfeiture may seem in relation to the actual damage suffered by the Government." *Id.* at 499. Consequently, the government would have received "a recovery wholly out of proportion to actual loss" and we observed further that the bank employee was additionally liable for criminal penalties. *Id.* at 500. In light of the disproportionate civil sanctions at issue, we sought guidance in the vicarious liability principles that govern criminal law. *See id.* at 498-500 (citing RESTATEMENT (SECOND) OF AGENCY §§ 217D cmt. d, 235 (1958)). We incorporated the criminal standard into the civil FCA in part, holding "that the knowledge or guilty intent of an agent not acting with a purpose to benefit his employer, will not be imputed to the employer, when the latter is sought to be held liable under a statute requiring knowledge or guilty intent." *Id.* at 499-500.

We have elaborated little on the holding in *Ridglea* nor have we applied it to any other civil statute.[11] In *Ridglea* itself, we acknowledged the outcome was in tension with precedent generally construing FCA double damages and forfeiture provisions. *Id.* at 500 (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549 (1943) (upholding the FCA against Double Jeopardy Clause challenge as a penal sanction, concluding that "[w]e cannot say that the remedy

---

[11] We applied *Ridglea* to civil FCA suits in *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008), *Hangar One*, 563 F.2d at 1158, *Peterson v. Weinberger*, 508 F.3d 45, 53 (5th Cir. 1975), *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972), and *Henry v. United States*, 424 F.2d 677, 679 (5th Cir. 1970). We applied it in a criminal case in *United States v. Tupelo Flight Ctr., Inc.*, 12 F.3d 1099 (5th Cir. 1993) (unpublished) and discussed it in a diversity suit for conversion under Texas law in *Bankers Life Ins. Co. of Neb. v. Scurlock Oil Co.*, 447 F.2d 997, 1004 n.12 (5th Cir. 1971).

now before us requiring payment of a lump sum and double damages will do more than afford the government complete indemnity for the injuries done it")); *see also United States v. Bornstein*, 423 U.S. 303, 315 n.11 (1976); *United States v. Halper,* 490 U.S. 435, 446 (1989) (assessing the Double Jeopardy Clause implications of FCA civil awards, describing "that the Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas, such as reasonable liquidated damages or a fixed sum plus double damages."), *abrogated by Hudson v. United States*, 522 U.S. 93 (1997).

Moreover, since *Ridglea*, the Supreme Court has provided additional guidance in evaluating the elements required to assert vicarious liability under federal civil suit provisions. In *ASME*, 456 U.S. at 558-59, the Court addressed whether ASME, a non-profit engineering standard-setting body, could be held liable under the Sherman Antitrust Act for the fraudulent activity of members of one of its subcommittees, "performed with apparent authority." The Court reiterated "that under general rules of agency law, principals are liable when their agents act with apparent authority and commit torts analogous to the antitrust violation presented by this case," including when "the agent acts solely to benefit himself." *Id.* at 565-66; *see also id.* at 567 ("The apparent authority theory has long been the settled rule in the federal system."). Turning to the antitrust law's statutory purpose, the Court found that "the apparent authority theory is consistent with the congressional intent to encourage competition." *Id.* at 570. It also noted that requiring an employee act to benefit the employer before imputing liability would stymie the law's purpose. *Id.* at 573-74. The Court further rejected the petitioner's reliance on *Ridglea* to argue the antitrust statute's treble damages remedy was punitive such that it triggered more restrictive vicarious liability rules. *Id.* at 574-76 & n.14. The Court acknowledged that the treble damages provision was "designed in part to punish

past violations," but stated that it functioned "primarily as a remedy for the victims" and also as a deterrent. *Id.* at 575. It concluded: "Since treble damages serve as a means of deterring antitrust violations and of compensating victims, it is in accord with both the purposes of the antitrust laws and principles of agency law to hold ASME liable for the acts of agents committed with apparent authority." *Id.* at 575-76. Under *ASME*, we must construe federal civil remedies statutes in harmony with the common law apparent authority rule for attributing vicarious liability, unless Congress signals its intent to adopt a different approach. *See id.* at 568-70 & n.6.

Applying those principles, we first find § 55(a)(1) is meaningfully distinct from the provisions we analyzed in *Ridglea*. The per-occurrence penalty in the AKA, unlike the mandatory $2000 forfeiture at issue in *Ridglea*, is not obligatory upon finding the defendant liable. The Act provides that the government "may recover . . . *not more than* $[11,000] for each occurrence of prohibited conduct." § 55(a)(1) (emphasis added). Courts retain the discretion to tailor the size of the per-occurrence penalty they award under § 55(a)(1) to fit the facts of the case. *See United States v. Lippert*, 148 F.3d 974, 978 (8th Cir. 1998) (observing, in conducting an Excessive Fines Clause analysis of an award under § 55(a)(1), that the district court declined to permit recovery beyond double damages); *Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 122-23 (2007) (finding that imposing the per-occurrence penalty "is warranted in this case"). It is true, as KBR emphasizes, that the double damages and per-occurrence penalties may result in recoveries in excess of the proven value of the kickback exchanged. Nonetheless, in construing a prior version of the AKA, the Supreme Court emphasized the insufficiency of recovering the simple, estimated dollar value of a kickback to fully compensate the government for its kickback-related losses:

> The second false assumption underlying Acme's argument is that
> the increased cost of the Government is necessarily equal to the

amount of the kickback which is recoverable. Of course, a subcontractor who must pay a kickback is likely to include the amount of the kickback in his contract price. But this is not all. A subcontractor who anticipates obtaining a subcontract by virtue of a kickback has little incentive to stint on his cost estimates. Since he plans to obtain the subcontract without regard to the economic merits of his proposal, he will be tempted to inflate that proposal by more than the amount of the kickback. And even if the Government could isolate and recover the inflation attributable to the kickback, it would still be saddled with a subcontractor who, having obtained the job other than on merit, is perhaps entirely unreliable in other ways. This unreliability in turn undermines the security of the prime contractor's performance—a result which the public cannot tolerate, especially where, as here, important defense contracts are involved.

*Acme Process Equip. Co.*, 385 U.S. at 144-45; *see also ASME*, 456 U.S. at 475 (noting the treble damages provision at issue helped compensate for the costs in bringing a private suit). We discern no persuasive evidence of congressional intent in § 55(a) to vary from the common law norm of permitting vicarious liability for employee actions taken under apparent authority.[12]

KBR also argues we should apply "heightened proof" requirements hewn by the law of vicarious liability applicable to punitive damages statutes, including that offending employees must have acted within their scope of employment and have been of managerial rank. In *Kolstad*, the Supreme Court made clear that "[t]he common law has long recognized that agency principles limit vicarious liability for punitive awards," a rule "this Court historically has

---

[12] As the government references, other courts have read *ASME* and subsequent amendments to the FCA to cast doubt on the act-to-benefit requirement even in the FCA context in which we distilled it. *See United States v. O'Connell*, 890 F.2d 563, 568 (1st Cir. 1989); *United States ex rel. Shackelford v. Am. Mgmt., Inc.*, 484 F. Supp. 2d 669, 675 (E.D. Mich. 2007); *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 118 n.2 (D.D.C. 2003); *cf.* CLAIRE M. SYLVIA, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT § 4:63 (2012 ed.) (noting pre-1986 decisions imposing an intent-to-benefit requirement are "contrary" to *ASME*'s holding). *Ridglea* is our court's precedent in FCA cases. But for the reasons outlined above, *Ridglea* does not control in the AKA's distinctive statutory context.

endorsed." 527 U.S. at 541; *see also id.* at 542-43 (quoting and applying RESTATEMENT (SECOND) OF AGENCY § 217C (1958), which separately enumerates rules for vicarious liability for punitive damages). KBR reasons that § 55(a)(1) is a statute with a punitive purpose. Nonetheless, KBR cites no case in which a court has applied punitive damages vicarious liability principles to a statute that, by its terms, does not expressly provide for punitive damages.[13] Rather, the Supreme Court rejected that reasoning in *ASME*, finding the deterrence and compensatory rationales of the antitrust laws required applying an apparent authority rule, in spite of those laws also bearing punitive characteristics. 456 U.S. at 575-76. We see no cause in the AKA to stretch *Kolstad*'s holding expansively, as KBR's position requires. *See United States ex rel. Bryant v. Williams Bldg. Corp.*, 158 F. Supp. 2d 1001, 1006, 1008 (D.S.D. 2001) (rejecting the argument that *Kolstad* should apply to the FCA because of the FCA's punitive purposes).

Nor does § 55(a)(1), with its caps on the damages the government may recover, bear the hallmarks of a punitive damages provision. *See* RESTATEMENT (FIRST) OF TORTS § 908 (1939) (providing that punitive damages are "awarded against a person to punish him for his outrageous conduct," and "their allowance and amount are within the discretion of the trier of fact"). That dissimilarity is significant because the Restatement (Second) of Agency cautions that the punitive damages rule "stated in this Section does not apply to the interpretation of special statutes such as those giving triple damages, as to which no statement is made." RESTATEMENT (SECOND) OF AGENCY § 217C cmt. c (1958). Likewise, the Supreme Court has observed that while the treble damages and civil

---

[13] Nor has a case been offered for the proposition that designating the recovery in § 55(a)(1) a "penalty" renders the double damages and per-occurrence penalties punitive in purpose for determining vicarious liability. To the contrary, § 55(a)(2) calls its recovery of value "equal to the amount of the kickback," a "civil penalty" as well. *See* § 55(a)(2).

forfeitures provisions in the FCA may be punitive in some respects, "[t]reble damages certainly do not equate with classic punitive damages, which leave the jury with open-ended discretion over the amount." *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 131-32 (2003).  We decline to apply law crafted in the context of punitive damages provisions to alter the generally applicable common law rules for a non-punitive-damages law like the AKA.  We conclude that neither the act-to-benefit pleading standard we adopted in *Ridglea,* nor standards fitted to punitive damages statutes, govern when alleging a violation of § 55(a)(1).  We find the government at this threshold point has adequately stated an AKA claim.[14]

## CONCLUSION

Accordingly, we REVERSE the district court's ruling granting KBR's motion to dismiss for failure to state an AKA claim under § 55(a)(1), and we REMAND for further proceedings in accordance with this opinion.

---

[14] We emphasize that, as this case progresses on remand, the government must of course provide evidence that KBR officials acted under apparent authority in accepting kickbacks before the government may prove a knowing violation of § 55(a)(1) by KBR.  Under that standard, it is clear that KBR cannot be exposed to an unexpected flood of liability for nefarious acts of any and every member of its worldwide workforce.  *See KBR II*, 103 Fed. Cl. at 773-74.  Resolving whether the kickback-accepting employees in this case possessed the apparent authority to implicate their employer will be of necessity, like proof of knowledge, a fact-intensive inquiry, capable of resolution only after opportunity for discovery.  *See In re Hellenic*, 252 F.3d at 395.

No. 12-40447

E. GRADY JOLLY, Circuit Judge, concurring in the judgment:

The majority in this case purports to engage in statutory interpretation while failing to address critical words of the statute. Thus, while I concur in the outcome the majority reaches, I do not join in their analysis.

The question presented in this appeal is whether § 55(a)(1) allows for vicarious liability. Upon finding § 55(a)(1) imposes liability on a "person," the majority quickly concludes the answer is yes. Though this conclusion may be correct, the majority reaches this holding without adequately considering the remainder of provisions § 55(a)(1) and (2). This analytical step is in error, as the type of "person" from which the government may recover differs under § 55(a)(1) and (2)—and in neither provision is a "person" unencumbered. Namely, § 55(a)(1) allows recovery "from a person that knowingly engages in conduct prohibited by section [53] of this title," while § 55(a)(2) provides for recovery from a person "whose employee, subcontractor, or subcontractor employee violates section [53] of this title[.]" § 55(a)(1) & (2).

To engage in proper statutory interpretation, we must address the phrases describing "person" before discerning whether vicarious liability is available under § 55(a)(1). The majority correctly notes that corporations are generally considered persons for statutory purposes. Accordingly, if we stop reading after "person," § 55(a)(1) does, by its plain terms, encompass the acts of employees. But if we read the entire provision, the question becomes: which employees? Section 55(a)(1) tells us that only "person[s] that *knowingly*" take kickbacks are covered. § 55(a)(1) (emphasis added). Here, "knowingly" modifies "person"—making it a qualifier essential to determining whether vicarious liability may arise. The government may not, under this provision, recover from any persons (or corporations), but only those who act with the requisite knowledge. Under the facts of this case, the knowledge requirement means that,

No. 12-40447

when a corporation is being sued, the corporation (i.e., person) itself must have knowledge of the kickback before liability may arise.[1]

This requirement, in turn, compels us to ask when we may say that a corporation has "knowingly" become part of kickback activity. Due to the nature of corporations, any knowledge attributed to a corporation must necessarily be imputed to that corporation from some individual person. *See F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992); FLETCHER § 787. "[A] court may deem only the knowledge of officers and employees at a certain level of responsibility imputable to the corporation." FLETCHER § 790. And "[w]hether an individual's knowledge will be imputed to the corporation depends on a factual determination, according to the particular circumstances, of the individual's position in the corporate hierarchy; the person need not necessarily be either a shareholder or an officer." FLETCHER § 807; *F.D.I.C.*, 967 F.2d at 171 ("Where the level of responsibility begins must be discerned from the circumstances of each case." (quoting *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983))). But "knowledge of a mere employee of the corporation ordinarily is not imputed to the company." FLETCHER § 807; *F.D.I.C.*, 967 F.2d at 171 (noting the "knowledge of individuals **at a certain level of responsibility** must be deemed . . . knowledge of the organization" (quoting *Continental Oil*, 706 F.2d at 1376) (emphasis added)); *In re Hellenic Inc.*, 252 F.3d 391, 395 (5th Cir. 2001) ("While courts generally agree that the knowledge of directors or key officers, such as the president and vice president, is imputed to the corporation, they differ as to the effect of knowledge acquired

---

[1] This corporate knowledge requirement is a factor distinguishing § 55(a)(1) and § 55(a)(2)—because we can assume a person who is being bribed always knows he is being bribed, the knowledge requirement would not add to this provision if it applied to employees rather than to the corporation itself. Moreover, that § 55(a)(1) applies to a "person" while § 55(a)(2) applies to a person's "employee, subcontractor, or subcontractor employee" further supports this plain reading of the text, which requires knowledge of the person (i.e., corporation) itself.

by other employees."); *Kellogg Brown & Root Servs., Inc. v. United States* (*KBR II*), 103 Fed. Cl. 714, 773-74 (2012) (finding two mid-level managers had insufficient authority to impute their knowledge to KBR for purposes of § 55(a)(1)).  Thus, properly construed, § 55(a)(1) holds corporations liable only for the knowing violations of those employees whose authority, responsibility, or managerial role within the corporation is such that their knowledge is imputable to the corporation.

At this point, it is important to recognize that, in corporate law, "The acts of a corporation's vice-principals are considered to be the acts of the corporation itself and are imputed to the corporation.  Thus, the liability of a corporation for the acts of its vice-principals is direct rather than vicarious."  FLETCHER § 4877. In certain situations, then, § 55(a)(1) may not be punishing vicarious, but rather direct, liability.  Because corporate law further tells us that knowledge of employees other than vice-principals may be imputable to a corporation, however, § 55(a)(1) may also impose vicarious liability—but it does so only when the knowledge of the employee is imputable to the corporation, not in all circumstances.  *See* FLETCHER, § 807 (noting individuals whose knowledge has been found imputable to the corporation include, among several others, vice-principals, managers, treasurers, attorneys, stockbrokers, and company physicians).  This distinction between "direct" and vicarious liability is another reason it is error to assume § 55(a)(1) allows for vicarious liability without determining what it means for a corporation to "knowingly" engage in kickback activity.

This conclusion as to the meaning of § 55(a)(1) leads us to the next step in the statutory analysis: asking whether a corporation's liability differs under § 55(a)(1) and § 55(a)(2).  In other words, we ask whether this plain reading of the text affords individual expression to both subsections.  A careful analysis of the liability available under each subsection illustrates that the answer to this

question is yes. Under § 55(a)(1), the government must prove a "knowing[]" violation before it may obtain double damages and per-occurrence recoveries. *See* § 55(a)(1). Section 55(a)(2), to the contrary, requires no proof of "knowing" misconduct before allowing recovery of "a civil penalty equal to the amount of th[e] kickback." *See* § 55(a)(2). Instead, it imposes traditional strict liability upon corporations for the acts of their employees. Traditionally, corporations are held liable for the torts of employees acting within the scope of their employment or with apparent authority. RESTATEMENT (SECOND) OF AGENCY § 219. I note that, if this rule were the entirety of the test under § 55(a)(1), that provision would impose liability identical to § 55(a)(2): an employee who is bribed will always have apparent authority—it would be nonsensical to give a kickback to an employee who lacked the apparent authority to accomplish its object. The requirement that an employee not only have apparent authority, but also have sufficient responsibility or authority within the company to attribute his knowledge to the corporation itself is therefore the distinguishing aspect of § 55(a)(1).

Furthermore, as the majority notes, "[i]t is entirely consistent for the statute to punish knowing violations more severely than those of which the corporation was unaware." *See KBR II*, 103 Fed. Cl. at 773. And because knowing violations of § 55(a)(1) only arise when employees whose knowledge is imputable to the corporation knowingly engage in kickback activity, corporations are liable for fewer of their employees' violations under § 55(a)(1) than under § 55(a)(2).

Accordingly, a thoroughly-conducted statutory analysis demonstrates that § 55(a)(1) permits the government to attribute liability to corporate defendants vicariously in cases where the knowledge of the employees is imputable to the corporation. Before concluding, I would observe that whether an employee has sufficient responsibility or authority to impute his knowledge to the corporation

is a highly fact-intensive analysis. *See* FLETCHER, § 807; *F.D.I.C.*, 967 F.2d at 171 (quoting *Continental Oil*, 706 F.2d at 1376); *In re Hellenic Inc.*, 252 F.3d at 394-96 ("The decision on whether to impute knowledge acquired by such employees tends to be fact-intensive and contingent on the specific legal regime involved."); *KBR II*, 103 Fed. Cl. at 773-74 (analyzing the titles, the responsibilities, and the factors surrounding the hiring of two mid-level managers). Because this issue has not yet been examined, the district court will need to conduct such an analysis on remand. This analysis will likely involve developing the evidence, both factual and expert, regarding the employees' job titles, their actual responsibilities, and their overall place within the company, among other things.

In conclusion, I agree with the majority's ultimate decision to remand this case for further factual development, but disagree with its analysis, as it does not comport with basic tenets of statutory interpretation.