IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 00-30428

———————————————

In Re: In the Matter of the Complaint: HELLENIC INC.,
as Owner & Operator of the Spud Barge Athena 107
for Exoneration from or Limitation of Liability,
doing business as Athena Construction
--------------------------
HELLENIC INC., In the Matter of the Complaint of Hellenic Inc.
as Owner & Operator of the Spud Barge Athena 107
for Exoneration from or Limitation of Liability,
doing business as Athena Construction,

                                    Plaintiff - Appellant,

                    versus

BRIDGELINE GAS DISTRIBUTION LLC; TEXACO EXPLORATION
AND PRODUCTION INC.,

                                    Defendants - Appellees.

———————————————

Appeal from the United States District Court
for the Western District of Louisiana

———————————————

May 21, 2001

Before REYNALDO G. GARZA, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

     This case requires us to return again to the Limited Liability

Act. The vessel owner appeals a denial of limited liability for

damage caused by one of its employees to a submerged pipeline,

arguing that the company lacked the requisite "privity and knowledge." We find the argument persuasive and now reverse.

I

Athena Construction is a division of Appellant Hellenic, Inc. Athena has been engaged in marine construction since the late 1970s. It is the only division of Hellenic engaged in maritime work. Athena contracted with Texaco Exploration and Production, Inc. to install pipeline in Texaco's Rabbit Island Field in Atchafalaya Bay, Louisiana. On February 7, 1997, the Athena 107—a "spud barge" owned by Athena—was "spudded down" in the field.[1] In the early morning hours of February 8, 1997, wind and sea moved the Athena 107, causing it to strike and rupture a twenty-inch natural gas pipeline owned by Bridgeline Gas Distribution LLC. The parties have stipulated that Bridgeline spent $250,959.90 to repair the line.

Dana Lee, a construction superintendent employed by Athena, made the decision to leave the barge unmanned and anchored by its spuds. Lee had worked on the Rabbit Island Field for approximately fifteen years. He had authority over the operation of all four vessels used by Athena in the project, including the Athena 107. He also supervised two contract divers engaged by Athena to bury

---

[1] A spud barge is a "flat-decked floating structure that has devices similar to legs, called spuds, which are lowered from underneath the barge and pushed into the waterway floor to anchor the structure in place." *Hurst v. Pilings & Structures, Inc.*, 896 F.2d 504, 506 (11th Cir. 1990).

pipeline. In addition, he dealt with Texaco's project inspectors regarding whether Texaco would conduct a survey to determine the existence of other pipelines in the vicinity. He was required to confer with Drake Stansbury, Athena's president, only if Texaco suggested that work be done which appeared to fall outside the scope of the project.

Lee formed part of Athena's relatively compact corporate structure. In addition to Stansbury, two other employees exercised management responsibility: Albert Aucoin, Athena's General Superintendent, and Phillip Thomas, Athena's Safety Director. Beneath Aucoin and Thomas on the corporate hierarchy were Athena's four construction supervisors, or field superintendents: Dana Lee, Charles Clinton, Jimmy Aucoin, and Billy Kennerson. Each construction supervisor was in charge of supervising the particular construction project in the field he had been assigned.

For purposes of the Rabbit Field project, Stansbury considered Lee his "eyes and ears on the job." However, Stansbury also testified that construction supervisors do not make "business decisions" on behalf of Athena. For instance, Lee could not execute binding contracts, set Athena's prices, or hire and fire Athena employees.[2] Nor did he have any administrative responsibilities with either Athena or Hellenic. It is undisputed, however, that Lee had authority to decide whether and under what circumstances a

---

[2] Drake Stansbury testified that Albert Aucoin, Athena's general superintendent, had the authority over personnel decisions.

3

barge would remain in the field overnight. Both parties agree that Lee was negligent in deciding on February 7, 1997 to leave the barge unmanned and that his decision caused the damage to the pipeline.

On August 7, 1997, Hellenic filed a Complaint for Exoneration from or Limitation of Liability. Pursuant to the Limited Liability Act,[3] Hellenic sought to limit its liability to the value of the Athena 107 and its pending freight. Texaco and Bridgeline then filed a complaint seeking to recover their costs. The actions were consolidated. After a bench trial, the district court determined that Hellenic and Texaco were both negligent and apportioned fault on the following basis: Hellenic 60 percent, Texaco 40 percent. The district court denied Hellenic's request for limited liability. The court awarded Bridgeline the stipulated amount of damages, $250,959.90. Hellenic appeals this ruling.

## II

Hellenic challenges only the district court's denial of limited liability.[4] This Court reviews such a determination for clear error.[5] The Limited Liability Act allows a vessel owner to

---

[3] *See* 46 U.S.C. §§ 183(a), 185 (2001).

[4] Hellenic concedes the district court's finding of negligence and damages.

[5] *See Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993).

4

limit its liability for any loss or injury caused by the vessel to the value of the vessel and its freight.[6] "Under the Act, a party is entitled to limitation only if it is 'without privity or knowledge' of the cause of the loss."[7] If the shipowner is a corporation, "knowledge is judged by what the corporation's managing agents knew or should have known with respect to the conditions or actions likely to cause the loss."[8] Once the claimant establishes negligence or unseaworthiness, the burden shifts to the owner of the vessel to prove that negligence was not within the owner's privity or knowledge.[9]

The 1895 Act was originally passed "to ensure that American shipping attracted investment capital that the threat of unlimited exposure might divert to England," which at that time already

---

[6] 46 U.S.C. § 183(a) provides: "The liability of the owner of any vessel . . . for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." The exception articulated in subsection (b) is inapplicable to this case.

[7] *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir. 1994).

[8] *Id.*

[9] *See Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991).

granted its ships limited liability.[10] The Act predates both the dominant position of the corporation, which provides limited liability, and the current breadth of insurance protection.[11] This Court has described the Act as "hopelessly anachronistic," and has implied that courts should accord it a narrow construction.[12]

The "privity or knowledge" exception has proven difficult to apply. Congress did not define these terms, leaving to courts the task of filling these "empty containers" with meaning.[13] In turn, we have observed that the question of "privity or knowledge must turn on the facts of the individual case,"[14] stating that a corporation "is charged with the privity or knowledge of its employees when they are sufficiently high on the corporate ladder."[15] We have further explained that privity or knowledge "is imputed to the corporation when the employee is 'an executive officer, manager or superintendent whose scope of authority

---

[10] *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1375-76 (5th Cir. 1983) (en banc).

[11] *See id.* at 1376; *see also Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 437 (1954); *In re Hercules Carriers, Inc.*, 768 F.2d 1558, 1564-65 (11th Cir. 1985).

[12] *Continental Oil Co.*, 706 F.2d at 1376.

[13] *Brister*, 946 F.2d at 355 n.2 (quoting Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 877 (2d ed. 1975)).

[14] *See Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir. 1975).

[15] *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993).

6

includes supervision over the phase of the business out of which the loss or injury occurred.'"[16]

These observations reflect, if unevenly, broader and familiar principles of agency law. A corporate principal is generally considered to know what its agents discover concerning those matters in which the agents have power to bind the principal.[17] An agent's knowledge is imputed to the corporation where the agent is acting within the scope of his authority and where the knowledge relates to matters within the scope of that authority.[18] While courts generally agree that the knowledge of directors or key officers, such as the president and vice president, is imputed to the corporation,[19] they differ as to the effect of knowledge

---

[16] *Id.* (quoting *Coryell v. Phipps*, 317 U.S. 406, 410 (1943)); *see also In re Kristie Leigh Enters., Inc.*, 72 F.3d 479, 481 (5th Cir. 1996) (holding that a corporate owner is charged with knowledge of "any of its managing agents who have authority over the sphere of activities in question.").

[17] *See American Standard Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 270-71 n.16 (5th Cir. 1981); *W.R. Grace & Co. v. W. U.S. Indus., Inc.*, 608 F.2d 1214, 1218 (9th Cir. 1979); *Restatement (Second) of Agency* § 272 (1958).

[18] *See Volkswagen of America, Inc. v. Robertson*, 713 F.2d 1151, 1163 (5th Cir. 1983) (applying Louisiana law); *American Standard Credit, Inc.*, 643 F.2d at 270-71 n.16; 18B Am. Jur. 2d Corporations § 1671 (1985).

[19] *See City State Bank in Wellington v. U.S. Fidelity & Guaranty Co.*, 778 F.2d 1103, 1109-10 (5th Cir. 1985); *American Standard Credit,* 643 F.2d at 270-71 n.16; *In re Pubs, Inc. of Champaign*, 618 F.2d 432, 438 (7th Cir. 1980); *Whitten v. Bob King's AMC/Jeep, Inc.*, 231 S.E.2d 891, 894 (N.C. 1977); 18B Am. Jur. 2d Corporations § 1673. *But cf. In re American Biomaterials Corp.*, 954 F.2d 919, 927 (3d Cir. 1992) (holding that a corporation can not

acquired by other employees. The decision on whether to impute knowledge acquired by such employees tends to be fact-intensive and contingent on the specific legal regimes involved.[20]

Some threshold for imputation is required. As this Court has noted in applying the Limited Liability Act, "[b]ecause a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization, 'else it could always limit its liability.'"[21] At one level, then, the imputation of knowledge is a creature of necessity.

In restricting the privity and knowledge exception to managing agents, however, the limited liability doctrine is also sensitive to the scope of an owner's control over his agents. Thus, a master's navigational errors at sea are generally not attributable

---

automatically be held vicariously liable for penalties imposed due to officers' criminal acts against the corporation).

[20] *See Lee v. Mitcham*, 98 F.2d 298, 301 (D.C. Cir. 1938) (imputing knowledge of treasurer to corporation in dispute over payment of notes); *Marvel Specialty Co. v. Magnet Mills, Inc.*, 297 F. Supp. 1026, 1030 (S.D.N.Y. 1969) (imputing comptroller's knowledge to corporation in patent infringement suit); *Georgia Pac. Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 762-63 (C.C.P.A. 1980) (imputing knowledge of salespersons to corporation in trademark dispute). *Cf. United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977) (holding that a corporation may be vicariously liable under the False Claims Act for the conduct of employees other than those possessing "substantial authority and broad responsibility").

[21] *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983) (en banc) (quoting *Coryell v. Phipps*, 317 U.S. 406, 410-11 (1943)).

to the owner.[22] When the owner is so far removed from the vessel that he can exert no control over the master's conduct, he should not be held to the master's negligence. In such cases, the owner may rely on the master's skill and expertise.[23]

This reasoning is consistent with the principle that "[t]he duty to control increases along with the possibility of control."[24] Indeed, one justification for vicarious liability is that it encourages employers to more effectively supervise employees.[25] Where a corporation grants its agents significant discretion and autonomy, it is reasonable to deny limitation and thereby hold the company liable for the full range of consequences resulting from its decision. Where greater supervision is not possible—e.g., where the master is at sea, far from the owner's control—limited

---

[22] *See id.* at 1376-77 & n.15.

[23] *See id.* at 1377 n.15; Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 877 (2d ed. 1975); *see also Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502, 511-12 (1932).

[24] *Avera v. Florida Towing Corp.*, 322 F.2d 155, 165 (5th Cir. 1963) (quoting Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 704 (1st ed. 1957)); *Waterman Steamship Corp. v. Gay Cottons*, 414 F.2d 724, 734 (9th Cir. 1969); *see also In re Patton-Tully Transp. Co.*, 797 F.2d 206, 211-12 (5th Cir. 1986).

[25] *See Ridglea*, 357 F.2d at 499.

liability is more desirable.[26] The "managing agent" standard reflects these concerns.[27]

The dispositive question in this case is therefore whether Lee's position in the corporate hierarchy was sufficiently elevated to impute his knowledge to Athena. We have emphasized that it is the "extent of the employee's responsibility, not his title, [that] determines whether limitation is foreclosed."[28] Courts are to determine whether the employee is a "managing agent with respect to the field of operations in which the negligence occurred."[29] Although this determination is case-specific, courts have looked to a number of factors: (1) the scope of the agent's authority over

---

[26] The mere possibility of control, however, does not automatically trigger a denial of limited liability. *See Waterman Steamship Corp.*, 414 F.2d at 734-35 ("Although modern communication and transportation facilities make all acts performed in any foreign port within the potential control of the shipowner, we believe that an extension of the requirement of privity or knowledge to cover all such acts should only come from Congress.") (footnotes omitted).

[27] We emphasize that autonomy and discretion may be desirable and necessary for the functioning of a business. The agency principles articulated in the limited liability context merely recognize that, at some level, employee autonomy carries a price. This doctrine attempts, in part, to discourage owners and corporate principals from willfully insulating themselves from knowledge and involvement with the operations of their subordinates merely to secure limited liability. *See Avera*, 322 F.2d at 163-64, 166.

[28] *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1377 n.16 (5th Cir. 1983) (en banc); *see also In re P. Sanford Ross, Inc.*, 204 F. 248, 251 (2d Cir. 1913) (per curiam).

[29] *Continental Oil Co.*, 706 F.2d at 1376.

10

day-to-day activity in the relevant field of operations;[30] (2) the relative significance of this field of operations to the business of the corporation;[31] (3) the agent's ability to hire or fire other employees;[32] (4) his power to negotiate and enter into contracts on behalf of the company;[33] (5) his authority to set prices;[34] (6) the agent's authority over the payment of expenses;[35] (7) whether the agent's salary is fixed or contingent;[36] and (8) the duration of his

---

[30] *See id.* at 1375-77; *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993); *Avera v. Florida Towing Corp.*, 322 F.2d 155, 160-63, 166 (5th Cir. 1963); *In re New York Dock Co.*, 61 F.2d 777, 778-79 (2d Cir. 1932). We might refer to the kind of authority articulated above as "operational authority." For present purposes, the agent's operational authority excludes the power to hire or fire, set prices, negotiate and execute contracts, and pay expenses. In this case, Lee exercised operational authority in deciding to leave the barge spudded down and unmanned overnight. As this Court's jurisprudence recognizes, an agent's operational authority is also measured by the extent to which his actions are subject to supervision.

[31] *See Continental Oil Co.*, 706 F.2d at 1376.

[32] *See Continental Oil Co.*, 706 F.2d at 1376; *Avera*, 322 F.2d at 162; *In re Jeremiah Smith & Sons, Inc.*, 193 F. 395, 397 (2d Cir. 1911).

[33] *See Continental Oil Co.*, 706 F.2d at 1375-76; *Avera*, 322 F.2d at 162; *Parsons v. Empire Transp. Co.*, 111 F. 202, 208 (9th Cir. 1901).

[34] *See Avera*, 322 F.2d at 162.

[35] *See Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1375 (5th Cir. 1983) (en banc); *Avera v. Florida Towing Corp.*, 322 F.2d 155, 162 (5th Cir. 1963); *In re Jeremiah Smith & Sons, Inc.*, 193 F. 395, 397 (2d Cir. 1911).

[36] *See Continental Oil Co.*, 706 F.2d at 1376; *Avera*, 322 F.2d at 161.

authority (i.e., full-time or restricted to a specific shift).[37] These factors are non-exhaustive and merely indicate the array of considerations that are potentially relevant to the managing agent inquiry.[38]

Two Fifth Circuit cases are particularly instructive: *Continental Oil Company v. Bonanza Corporation*[39] and *Cupit v. McClanahan Contractors, Inc.*[40] In *Continental Oil*, this Court found that a vessel captain was a managing agent for the owner. Bonanza, which was primarily engaged in land development, had a single maritime venture: operation of the vessel in question, which was chartered to scuba diving groups and other companies. The vessel captain was held to be a managing agent "with respect to the field of operations in which the negligence occurred" given the extent of his duties and "the minimal supervision he received from the corporate officers."[41] He had "carte blanche" to negotiate and carry out scuba charters, although he needed authorization to conduct

---

[37] *See Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993).

[38] Not every factor articulated above will be relevant in a given case. Moreover, we make no *a priori* judgment as to the relative importance of such factors. The weight given to each factor hinges on the specific facts of a case.

[39] 706 F.2d 1365 (5th Cir. 1983) (en banc).

[40] 1 F.3d 346 (5th Cir. 1993).

[41] *Continental Oil*, 706 F.2d at 1376.

other charters.[42] Despite nominal supervision, the captain further decided which purchases and repairs to make. He also hired the crew for each trip without consulting the vessel owner. In addition, he received a commission for each trip instead of a fixed salary. Observing that Bonanza was primarily engaged in land-based activities, the Court found that the captain was in near-complete control over Bonanza's maritime field of operations.[43]

In *Cupit*, this Court reversed the district court's finding that a toolpusher who was in charge of a drilling rig was a managing agent. While the toolpusher had "authority over all phases of operations" on the rig, this Court held that the district court had "overstate[d] the scope of [the toolpusher's] authority."[44] This Court observed: "[t]he fact that a ship's master has been given broad and unlimited agency powers over the operation and maintenance of the vessel is insufficient to impute the master's mistake to the shipowner."[45] During his shift, the toolpusher had authority over the drilling job as long as the rig was stationary and drilling. However, nine other toolpushers—i.e., one per rig—possessed similar authority for their respective rigs. The Court

---

[42] *Id.* at 1375.

[43] *Id.*

[44] *Cupit*, 1 F.3d at 348.

[45] *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993).

13

observed that the toolpusher's authority "did not extend to the basic business decisions made by the drilling supervisors and the president of the company."[46]

Although Lee's authority falls somewhere between the authority possessed by the agents in *Continental Oil* and *Cupit*, he shares more of the characteristics of the toolpusher in *Cupit*. On the one hand, Lee had greater authority than the toolpusher in *Cupit*, whose responsibility only extended to drilling operations on one among several rigs, and only during his shift.[47] In contrast, Lee supervised four vessels and the entire Rabbit Field project. However, he had no authority, once the job was completed, to decide when and where the next job would take place. Lee was also required to confer with Stansbury if Texaco suggested that work be done which appeared to fall outside the scope of the project. Unlike the captain in *Continental Oil*, he lacked the authority to enter into contracts and determine pricing. Nor was Lee given the power to hire and fire other employees. Whereas the captain in *Continental Oil* had authority over the company's entire maritime field of operations, Lee only exercised authority over one of the company's four construction projects. Although he may have possessed significant power over the management of an individual job, Lee could not make "basic business decisions" for Athena. Because he

---

[46] *Id.*

[47] *Cupit*, 1 F.3d at 348.

14

lacked this broader authority over business decisions undertaken by the corporation, Lee did not possess managing authority over "the field of operations in which the negligence occurred."[48] The undisputed facts of this case compel us to hold that the district court's finding was clearly erroneous.[49] We therefore REVERSE the judgment of the district court and REMAND for proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

---

[48] *Continental Oil*, 706 F.2d at 1376.

[49] *See Cupit*, 1 F.3d at 348 ("A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.") (quotations omitted).