**UNITED STATES of America, Plaintiff,**

**v.**

**KELLOGG BROWN & ROOT, INC., Defendant.**

**CIVIL ACTION NO. 1:04-CV-42**

United States District Court, E.D. Texas.

Signed 04/13/2015

Michael Wayne Lockhart, US Attorney's Office, Greg M. Dykeman, Michael Thomas Bridwell, Strong Pipkin Bissell & Ledyard LLP, Mitchell A. Toups, Weller Green Toups & Terrell LLP, Beaumont, TX, Stanley E. Alderson, Samuel J. Buffone, Jr., United States Department of Justice, Washington, DC, for Plaintiff.

Tirzah Lollar, Christine N. Roushdy, Craig D. Margolis, Vinson & Elkins LLP, Washington, DC, David Bradford Gaultney, Mehaffy Weber, PC, Austin, TX, Karl S. Stern, Quinn Emanuel Urquhart & Sullivan, Amy Catherine Dinn, Gardere Wynne Sewell LLP, Houston, TX, Patricia Diane Chamblin, Mehaffy & Weber, Beaumont, TX, Mary Carter Andrues, Arent Fox LLP, Los Angeles, CA, for Defendant.

## MEMORANDUM AND ORDER

### MARCIA A. CRONE, UNITED STATES DISTRICT JUDGE

Pending before the court is the government's Motion for Partial Summary Judgment (#130), wherein the government seeks summary judgment as to Defendant Kellogg Brown & Root, Inc.'s ("KBR") liability for forty alleged violations of the Anti-Kickback Act (the "AKA"), 41 U.S.C. §§ 51-58.[1] Having considered the pending motion, the submissions of the parties, and the applicable law, the court is of the opinion that the government's motion should be DENIED.

1. After this litigation commenced, Congress re-codified the AKA, placing it at 41 U.S.C. §§ 870107. *See* Public Contracts—Enact Certain Laws, Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3838-41 (2011). Because the parties continue to cite the prior version of the Act, the court will cite the prior version, as well.

2. Smoot and Bennett pleaded guilty to violations of the AKA related to these allegations in the United States District Court for the Central District of Illinois in July 2007 and August 2008, respectively.

## I. Background

On January 21, 2004, Relators David Vavra and Jerry Hyatt filed this action against KBR claiming, among other things, that from January 2002 until April 2005, KBR's Corporate Traffic Supervisor, Robert Bennett ("Bennett"), and other KBR employees accepted kickbacks of money, fees, gifts, meals, golf outings, and tickets to sporting and entertainment events (collectively, the "kickbacks") from Eagle Global Logistics ("EGL") employees Kevin Smoot ("Smoot")[2] and Thomas Kessner ("Kessner") in connection with subcontracts awarded to EGL for the transport of United States military equipment and supplies into Iraq.[3] The government subsequently intervened in the action, and, after this court's February 8, 2011, Memorandum and Order (#71), granting in part and denying in part KBR's Motion to Dismiss the United States' Complaint, the government voluntarily dismissed its remaining claims and filed an appeal with the United States Court of Appeals for the Fifth Circuit. On September 23, 2013, the Fifth Circuit reversed this court's dismissal for failure to state an AKA claim under § 55(a)(1), on the grounds that § 55(a)(1) permits employers to be held vicariously liable for their employees' kickback-related conduct and that the government pleaded facts sufficient to hold KBR liable for this conduct.

3. Bennett is alleged to have solicited, accepted, or attempted to accept the kickbacks from EGL and Panalpina, Inc. ("Panalpina"), in connection with subcontracts awarded to EGL and Panalpina under the Logistics Civil Augmentation Program ("LOGCAP III"), a series of contracts whereby the Army enlists private contractors to perform non-combat services in support of military operations across the globe. KBR is the primary contractor on LOGCAP III and performs some of its obligations under the agreement through subcontractors, such as EGL and Panalpina.

Upon remand, the government amended its complaint, maintaining only one claim against KBR: that KBR, acting through its employees, including Bennett and others, violated the AKA by "knowingly solicit[ing], accept[ing], or attempt[ing] to accept kickbacks from EGL and Panalpina in connection with subcontracts awarded to EGL and Panalpina under LOGCAP III." KBR, in turn, amended its answer, denying the government's claim and asserting various affirmative defenses.

The government filed the instant motion on November 17, 2014, arguing that there is no genuine issue of material fact as to KBR's liability for forty violations of the AKA because (1) Bennett acted with apparent authority while knowingly accepting forty kickbacks from employees of EGL and (2) KBR is vicariously liable for each of these violations. The government estimates the total amount of the kickbacks to be $6,000 and requests that the court assess a civil penalty of $452,000 against KBR. In response, KBR denies the government's assertions, contending that: (1) there is no evidence that Bennett and, therefore, KBR, accepted a single illegal kickback; (2) Bennett had no apparent authority to accept kickbacks; (3) Bennett's knowledge cannot be imputed to KBR to establish a knowing violation; and (4) the government's estimation of the statutory penalty is inflated and speculative.

## II. Analysis

### A. Summary Judgment Standard

A party may move for summary judgment without regard to whether the movant is a claimant or a defending party. *See Apache Corp. v. W & T Offshore, Inc.*, 626 F.3d 789, 794 (5th Cir.2010); *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 272 (5th Cir.2009). Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir.2012). Where, as here, "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see Addicks Servs., Inc. v. GGP–Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir.2010).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir.2012); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir.2010). Once a proper motion has been made, the nonmoving party "may not rest upon mere allegations or denials" in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n. 3, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013). "[T]he court must review the record

'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097; *Downhole Navigator, L.L.C. v. Nautilus Ins. Co.*, 686 F.3d 325, 328 (5th Cir.2012). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in its favor. *Groh v. Ramirez*, 540 U.S. 551, 562, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 192 (5th Cir.2011), *cert. denied,* —— U.S. ——, 133 S.Ct. 22, 183 L.Ed.2d 675 (2012).

 Nevertheless, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner–Lambert Co.*, 581 F.Supp.2d 772, 779 (E.D.Tex.2008) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)); *accord Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir.2012). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Eastman Kodak Co.*, 504 U.S. at 468–69, 112 S.Ct. 2072; *accord Shelter Mut. Ins. Co. v. Simmons*, 543 F.Supp.2d 582, 584–85 (S.D.Miss.), *aff'd*, 293 Fed.Appx. 273 (5th Cir.2008). Summary judgment may not be thwarted by conclusional allegations, un-

supported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *accord Stauffer v. Gearhart*, 741 F.3d 574, 581 (5th Cir.2014).

## B. The Anti Kickback Act

The AKA was amended in 1986 "to enhance the government's ability to prevent and prosecute kickback practices" in connection with contracts of the federal government. H.R. REP. NO. 99-964, at 4 (1986). The Act prohibits the acceptance or payment of a kickback, as well as the inclusion of any kickback in the cost of a contract. *See* 41 U.S.C. § 51 *et seq.*; H.R. REP. NO. 99-964, at 4 (1986). Under the Act, a kickback is defined as:

> any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

41 U.S.C. § 52(2). The Act also provides: (1) The United States may, in a civil action, recover a civil penalty from any person who knowingly engages in conduct prohibited by section 53 of this title. The amount of such civil penalty shall be—

> (A) twice the amount of each kickback involved in the violation; and
>
> (B) not more than $[11,000][4] for each occurrence of prohibited conduct.

---

**4.** "Acting under the authority of the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (2006), the Department of Justice increased the amount of the penalty in § 55(a)(1)(B) from $10,000,

its original statutory amount, to $11,000." *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 347 (5th Cir.2013) (citing 28 U.S.C. § 85.3(a)(13)).

(2) The United States may, in a civil action, recover a civil penalty from any person whose employee, subcontractor, or subcontractor employee violates section 53 of this title by providing, accepting, or charging a kickback. The amount of such civil penalty shall be the amount of that kickback.

41 U.S.C. § 55(a)(1)–(2).

The government seeks to recover a civil penalty from KBR under § 55(a)(1). Thus, to prevail on its motion for summary judgment, the government, as movant, must establish that there is no genuine issue of material fact as to whether KBR "knowingly engage[d] in conduct prohibited by [41 U.S.C. § 53]." 41 U.S.C. § 55(a)(1). In other words, the government must establish that (1) KBR engaged in conduct prohibited by 41 U.S.C. § 53 and (2) that KBR did so knowingly. Because KBR is a corporation, however, it "cannot act or have a mental state by itself." *United States ex rel. Vavra*, 727 F.3d at 348 (quoting 10 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 4877 (2012 ed.)) (internal quotation marks omitted). Therefore, in order to satisfy its burden, the government must advance theories of vicarious liability and imputation, demonstrating that KBR can be held liable for the acts and mental state of its employees, or, in this case, of Bennett.

### 1. Did KBR Engage in Conduct Prohibited by 41 U.S.C. § 53?

To establish that KBR engaged in prohibited conduct, the government must show that KBR is vicariously liable for Bennett's actions, by demonstrating either that (1) Bennett violated the AKA while acting within the scope of his employment or (2) Bennett acted with KBR's apparent authority in violating the AKA and that there was reliance upon his apparent authority. *See United States ex rel. Vavra*,

727 F.3d at 349 (citing RESTATEMENT (SECOND) OF AGENCY § 219 (1958)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp. (ASME)*, 456 U.S. 556, 565–67, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). Although the government asserts both forms of vicarious liability in its Sixth Amended Complaint, it asserts only the latter in the instant motion for partial summary judgment. Thus, because the government bears the burden of proof at trial on this element, it must demonstrate that there is no genuine issue of material fact that (1) Bennett solicited, accepted, or attempted to accept each of the forty kickbacks from EGL, and (2) that Bennett did so acting under KBR's apparent authority. *See United States ex rel. Vavra*, 727 F.3d at 349; *United States v. Peterson*, No. CV–11–4136–EFS, 2012 WL 315443, at *4 (E.D.Wash. Feb. 1, 2012); *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F.Supp.2d 95, 113 (W.D.Tex. 2010), *aff'd*, 689 F.2d 470 (5th Cir.2012); *Fontenot*, 780 F.2d at 1194.

### a. Did Bennett Accept Kickbacks in Violation of the AKA?

The government argues in its motion that "[t]here can be no dispute that Bennett knowingly accepted kickbacks in violation of the [AKA]" and that "Bennett's conduct is definitively established by his guilty plea" because "the kickbacks that form the basis for Bennett's plea" "are the very same kickbacks for which the government seeks judgment against KBR in this motion." KBR disagrees for four reasons: (1) Bennett's plea is not dispositive of KBR's liability for an AKA violation; (2) neither Bennett's nor Smoot's guilty plea can establish the existence of a kickback because they fail to show that a gratuity was exchanged for an improper purpose; (3) the government cannot actually prove

an improper purpose for the exchange; and (4) Bennett's guilty plea to one violation of the AKA cannot establish the existence of forty violations of the AKA.

As an initial matter, Bennett's plea agreement does "not support issue preclusion" because KBR was not a party to the underlying criminal proceedings, and KBR is free to dispute facts in both Bennett's and Smoot's pleas. *In re Enron Corp. Sec., Derivative & "ERISA" Litigation*, 491 F.Supp.2d 690, 704 (S.D.Tex.2007); *see United States v. Dynamics Research Corp.*, No. 03CV11965–NG, 2008 WL 886035, at *7 (D.Mass. Mar. 31, 2008). The government does not challenge this; rather, it argues that KBR cannot raise a genuine issue of material fact with respect to the facts articulated in the pleas.

Bennett pleaded guilty to a one-count information on August 7, 2008, which charged Bennett with violating the AKA, 41 U.S.C. §§ 53(2) and (54). The signed plea agreement stated that to prevail, the government must prove beyond a reasonable doubt:

> First, that the defendant solicited, accepted, or attempted to accept any kickback, that is, any … gratuity … which is provided, directly or indirectly, to any … prime contractor employee … for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract …; and Second, that the defendant did so knowingly and willfully.

Furthermore, the factual basis stipulated, in pertinent part:

> g. During the period from in or about March 1, 2003 through in or about April 29, 2005, the defendant accepted gratuities from Kevin Andre Smoot and other EGL employees at Smoot's direction on at least 40 different occasions,[5] with a value of approximately $6000. Such gratuities included meals, drinks, golf outings, and other gifts and entertainment.
> h. The defendant knew that he was not permitted to accept gratuities from EGL personnel involved in the LOGCAP III prime contract between KBR and the U.S. Army. . . .
> i. The defendant admits that he knew that when Smoot and those acting at Smoot's direction provided gratuities to the defendant that they did so with the intent of obtaining favorable treatment in connection with the freight-forwarding subcontract awarded by KBR to EGL under the LOGCAP III prime contract.

Similarly, Smoot pleaded guilty to a two-count information on July 20, 2007, which charged Smoot with one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2) and one count of violating the AKA, 41 U.S.C. §§ 53(1) and 54. To prove the AKA violation, the plea agreement stated that the government must prove beyond a reasonable doubt:

> First, that the defendant provided, attempted to provide, or offered to provide any kickback, that is, any … gratuity … which is provided, directly or indirectly, to any … prime contractor employee … for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract …; and Second, that the defendant did so knowingly and willfully.

The factual basis stipulated that "the defendant provided or authorized the providing of entertainment and other gratuities

---

**5.** KBR objects that the reference to forty gratuities is inadmissible hearsay. Even assuming that the reference falls under an exception to the rule against hearsay as a statement against Bennett's interest due to his death, the government is still unable to demonstrate conclusively that KBR is liable for forty AKA violations for the reasons set forth below. *See* FED. R. EVID. 804(b)(3).

to five KBR Houston-based Transportation Department personnel, who were prime contractor employees, for the purpose of improperly obtaining and rewarding favorable treatment in connection with LOGCAP III transportation subcontracts;" that "the defendant personally provided gratuities to KBR personnel on approximately 90 different occasions;" and that "[t]he defendant knew that it was illegal for him and his subordinate EGL employee to pay gratuities to KBR personnel involved in the LOGCAP III prime contract between KBR and the U.S. Army."

Despite these statements, KBR argues that Bennett and Smoot never conceded an improper purpose, nor did they "identify any specific favorable treatment rendered or anticipated." KBR asserts that "[t]he Bennett plea provides no evidence *whatsoever* of Bennett's purpose in accepting gratuities from EGL employees, and Bennett expressly disclaimed having had an improper purpose in accepting gratuities in his interviews with government investigators." (emphasis in original). KBR adds: "Smoot and his subordinate, Kessner (who is alleged to have offered gratuities to KBR employees as well), have expressly denied at deposition having had an improper purpose in offering the business entertainment alleged."

The evidence does not reflect that Smoot and Kessner disclaimed having an improper purpose. While KBR correctly notes that both Smoot and Kessner denied "bribing" KBR employees and responded in the negative when questioned about the examples of "favorable treatment" provided by Congress in the legislative history,[6] they nonetheless unquestionably revealed an intention to get favorable treatment from Bennett. *See* S. REP. No. 99-435, at 11

(1986). Smoot stated at deposition in this litigation that his intent was to get KBR "knowing us and developing a relationship with them, it would give us opportunities or at least look favorable on us." When the government asked for clarification that "the intent then was to get favorable treatment," Smoot responded, "Yes, sir." Further, at his plea hearing, Smoot stated that he provided the kickbacks "[t]o build relationships to get additional business." Smoot explained, "you know, when you develop relationships with customers in that type of business a lot of times when you have service issues it's not blown up—blown out of proportion, they don't change providers because you had a service failure. So those types of things as well as get additional business in the future." Likewise, Kessner stated at deposition:

> [W]e would never—never give [Bennett] direct cash or anything like that, but yeah, the entertainment, we believed that it would benefit us greatly.... [H]e was able to take the heat off of you if there was a problem, you know. He would either be able to tone it down in-country or either be able to, you know, not let it become a huge issue in Houston.

Kessner further explained that "it's a better deal" if KBR employees "know you and you're able to work it out with them, instead of it becoming a huge issue above, you know, their head."

Thus, considering Smoot's and Kessner's statements, it does not appear that they wholly disclaimed having an improper purpose. Smoot and Kessner admitted several times that they intended to obtain improper favorable treatment from Bennett in the performance of their subcontract. Further-

---

**6.** The list provided in the 1986 Senate Report is "not limited," and the Senate Report further provides that " '[f]avorable treatment' is intended to be construed broadly to reach the many types of improper behavior which may be the object of a commercial bribe." S. REP. No. 99-435, at 11.

more, even if Bennett "expressly disclaimed having had an improper purpose in accepting gratuities in his interviews with government investigators," the statute does not require that Bennett have an improper purpose, but only that the gratuity is *provided* for an improper purpose. 41 U.S.C. § 52(2). Thus, while construing the facts most favorably to KBR, the court finds that there is no issue of material fact with respect to whether Bennett accepted a kickback in violation of the AKA. *See Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir.1994).

### b. How Many Kickbacks Did Bennett Accept?

As noted above, the government moves for partial summary judgment as to forty alleged kickbacks on the part of Bennett, asserting that these forty AKA violations are conclusively established by Bennett's and Smoot's guilty pleas. The government points to Bennett's plea agreement, which states that he "accepted gratuities from Kevin Andre Smoot and other EGL employees at Smoot's direction on at least 40 different occasions, with a value of approximately $6000." Further, Smoot's plea agreement provides that Smoot "personally provided gratuities to KBR personnel on approximately 90 different occasions." KBR responds that the government is merely estimating forty occurrences and cannot prove each occurrence.

 Having considered the evidence presented, the court finds that KBR has raised a genuine issue of material fact as to the number of kickbacks Bennett actually accepted. In response to Bennett's and Smoot's plea agreements, KBR presented evidence that there were only forty-seven, not ninety, kickbacks arguably attributable to Smoot, that Smoot and Kessner both submitted false information on their expense reports, tending to inflate the number of kickbacks and the dollar value of the kickbacks in addition to including the names of persons who were not present, and that Bennett denied being present at certain events for which Smoot and Kessner filed expense reports. Consistent with the Fifth Circuit's directive that district courts not weigh evidence or judge the credibility of witnesses, this court may not weigh the credibility of the expense reports and deposition testimony against the credibility of government interviews and plea agreements. Rather, that duty is solely within the province of the fact finder. *See Zhang v. Gonzales*, 432 F.3d 339, 344 (2005). Thus, while the government has shown that Bennett accepted at least one kickback, the government has not met its burden to show conclusively that KBR can be held liable for the acceptance of forty kickbacks.

### c. Did Bennett Act with KBR's Apparent Authority?

 " 'Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the [principal], arising from and in accordance with the [principal's] manifestations to such third persons.' " *United States ex rel.Vavra*, 727 F.3d at 349 (quoting *ASME*, 456 U.S. at 566 n. 5, 102 S.Ct. 1935). The agent need not be acting for the benefit of the principal; so long as the agent is acting with apparent authority, the principal is liable despite the agent acting solely to benefit himself or the agent making misrepresentations. *See ASME*, 456 U.S. at 566–68, 102 S.Ct. 1935; *United States ex rel.Vavra*, 727 F.3d at 351. Under this theory, a principal is liable for its agent's actions because " 'the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.' " *ASME*, 456 U.S. at 566, 102

S.Ct. 1935 (quoting RESTATEMENT (SECOND) OF AGENCY § 261 cmt. a). When determining whether an agent was vested with apparent authority, courts look to "his position with the company and the circumstances surrounding his past conduct" in addition to "the parties' relations to one another, the undertaking in which the parties are engaged, and the general usages and practices of those engaged in such undertakings." *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1297 (5th Cir.1994); *United States v. Bi–Co Pavers, Inc.*, 741 F.2d 730, 737 (5th Cir.1984).

The government asserts that KBR vested Bennett with apparent authority "to act for KBR in connection with KBR's freight forwarding business" when it named him Corporate Traffic Supervisor for LOGCAP III and gave him day-to-day responsibility for supervising EGL's subcontract with KBR. KBR counters that it did not lead EGL employees to believe that Bennett was authorized to accept kickbacks; rather, KBR established a zero tolerance policy and "made clear that none of its employees working on government contracts had the authority, apparent or otherwise, to accept entertainment or gratuities from subcontractors."

█ KBR concedes that "Bennett was in a position to supervise EGL's freight forwarding subcontract" as the Corporate Traffic Supervisor for LOGCAP III and that he, along with other KBR employees, was involved in the oversight of the EGL subcontract. Thus, Smoot and Kessner could have reasonably presumed that Bennett, as a supervisor of the subcontract, would be the appropriate person to prevent things from being "blown out of proportion" or to "take the heat off." Indeed, Smoot and Kessner both stated, at deposition, that they believed Bennett had such authority. *See* Smoot Deposition (#130-2) at 18:11-13 ("Bob [Bennett] was in charge. He was in charge of the other people that

worked on LOGCAP."); Kessner Deposition (#130-2) at 248:2024 ("Bob was the—the business decision maker. I don't think for any of the other clients on that many times, I would be able to take that many—that—that many times to take those high dollar deals, unless it was a decision maker like Bob Bennett."). Further, KBR placed Bennett in such a position and vested him with the authority to supervise the EGL contract.

KBR spends much of its briefing explaining that it had a zero tolerance policy and that its employees, specifically Bennett, and the subcontractor employees, including Smoot and Kessner, knew that KBR employees were prohibited from accepting entertainment of any kind. While this may be true, the proper inquiry is not whether KBR vested Bennett with the authority to accept illegal kickbacks. Rather, it is whether KBR placed Bennett in such a position that Smoot and Kessner could have reasonably believed that Bennett was authorized to perform the tasks for which they provided the kickbacks, namely, ensuring that EGL's performance issues would be handled locally and would not be exaggerated. *See* RESTATEMENT (SECOND) OF AGENCY § 8 cmt. c. The court finds that it did. KBR named Bennett Corporate Traffic Supervisor and placed him in a position where he, along with others, supervised EGL's day-to-day performance under the subcontract, and Smoot and Kessner relied on Bennett's supervisory authority in providing the kickbacks. Accordingly, the government has met its burden of showing that there is no issue of material fact with respect to whether Bennett acted with apparent authority in accepting a kickback in violation of the AKA.

### 2. Did KBR Engage in Such Conduct Knowingly?

█ In addition to showing that Bennett acted with KBR's apparent authority

in violating the AKA, the government must also demonstrate that KBR acted knowingly. As previously noted, the government may "recover a civil penalty from *any person who knowingly engages in conduct* prohibited by section 53 of this title." 41 U.S.C. § 55(a)(1) (emphasis added); *see Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1368 (Fed.Cir. 2013) ("The difference between § 55(a)(1) and § 55(a)(2) is the degree of knowledge that must be proven"), opinion corrected on denial of reh'g, 563 Fed.Appx. 769 (Fed. Cir.2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 167, 190 L.Ed.2d 50 (2014). On appeal in this case, the Fifth Circuit did not make a "determination as to the knowledge requirement of this statute." *United States ex rel. Vavra*, 727 F.3d at 349. Thus, the court must determine what proof is required from the government to establish a knowing violation on the part of KBR. This is a distinct inquiry from that under the vicarious liability prong, although both concerns center on Bennett, as KBR's employee. While vicarious liability attempts to establish whether a corporation can be held liable for its employee's actions, knowledge imputation asks whether the employee's mental state can be attributed to the corporation. *See United States v. A & P Trucking Co.*, 358 U.S. 121, 127, 79 S.Ct. 203, 3 L.Ed.2d 165 (1958) ("A corporation is an artificial, legally created entity that can have no 'knowledge' itself and it said to have 'knowledge' only through its employees.").

The government asserts that it need only show that Bennett "knowingly accepted kickbacks while acting with apparent authority. No separate finding of knowledge of behalf of KBR (apart from the knowledge of the employee who accepted the kickbacks) is necessary for the Government to prevail." In support of its position, the government cites the Fifth Circuit's decision reviewing a prior decision of this court, *United States ex rel. Vavra*, 727 F.3d at 349, the Federal Circuit's decision reviewing a separate lawsuit involving KBR, *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1370 (Fed. Cir.2013), and the legislative history of the 1986 amendments to the AKA.

KBR, on the other hand, asserts that the government must prove that "KBR *itself* acted knowingly," which requires the government to establish that "the employee who allegedly accepted kickbacks, Robert Bennett, had the requisite 'authority, responsibility, or managerial role within the corporation' such that his knowledge is attributed to KBR."[7] For this proposition, KBR cites the legislative history of the 1986 amendments to the AKA and Judge Jolly's concurring opinion in *United States ex rel. Vavra*, 727 F.3d at 355.

---

7. KBR also asserts that the government must prove that KBR " 'knowingly' included the amount of the kickback in a contract price." KBR cites the 1986 amendments to the AKA, claiming that to establish a knowing violation, the government "must actually *prove* the contract price was inflated by the cost of the kickbacks." (emphasis in original). The legislative history cited demonstrates that KBR is mistaken. In this case, the government is asserting a § 55(a)(1) claim against KBR premised on a § 53(2) violation: that KBR "solicit[ed], accept[ed] or attempt[ed] to accept a kickback." *See* 41 U.S.C. §§ 53, 55. Had the government instead asserted that KBR was liable under § 55(a)(1) for a violation of § 53(3)—that KBR "include[d] the amount of a kickback prohibited by paragraph (1) or (2) in the contract price—(A) a subcontractor charges a prime contractor or a higher tier subcontractor; or (B) a prime contractor charges the Federal Government"—KBR is correct that the government would be required to prove that the amount of the kickback was knowingly included. Yet, because there is no such allegation in this case, the government need not establish that the amount of a kickback was included in a contract price or even that KBR actually accepted a kickback.

### a. *United States ex rel. Vavra*

In *United States ex rel. Vavra*, the Fifth Circuit "respectfully decline[d] to reach the question" of knowledge, as it was "unnecessary" to its holding. 727 F.3d at 349. The court specified that "defining what 'knowingly' entails in the context of the AKA is a nuanced, fact-reliant question unsuited for resolution at the motion to dismiss stage" and instructed that "as this case progresses on remand, the government must of course provide evidence that KBR officials acted under apparent authority in accepting kickbacks before the government may prove a knowing violation of § 55(a)(1) by KBR." *Id.* at 349, 353 n. 14. Because the record was not fully developed, the court "emphasize[d] that [it] [made] no determination as to the knowledge requirement of this statute, pleaded by the government in its complaint." *Id.* at 349.

In his concurrence, Judge E. Grady Jolly faulted the court for refusing to consider the knowledge requirement, stating that by "failing to address critical words of the statute," the majority's analysis "does not comport with the basic tenets of statutory interpretation." *Id.* at 354, 356. Rather, Judge Jolly asserted that the word "'knowingly' modifies 'person'—making it a qualifier essential to determining whether vicarious liability may arise." *Id.* at 354. Viewing the statute in this manner, Judge Jolly found that "the knowledge requirement means that, when a corporation is being sued, the corporation (i.e., person) itself must have knowledge of the kickback before liability may arise." *Id.* Judge Jolly explained that this distinction is critical "because we can assume a person who is being bribed always knows he is being bribed, [therefore] the knowledge requirement would not add to [§ 55(a)(1)] if it applied to employees rather than to the corporation itself." *Id.* at 354 n. 1. Having found that the government must show that the corporation had knowledge, Judge Jolly then looked to corporate law for an explanation of how an employee's knowledge may be imputed to a corporation such that the corporation can be said to have knowledge itself. After reviewing the law, Judge Jolly concluded that "properly construed, § 55(a)(1) holds corporations liable only for the knowing violations of those employees whose authority, responsibility, or managerial role within the corporation is such that their knowledge is imputable to the corporation," which is "a highly fact-intensive analysis." *Id.* at 355–56.

### b. *Kellogg Brown & Root Servs., Inc. v. United States*

The Federal Circuit's decision in *Kellogg Brown & Root Servs., Inc. v. United States* was issued less than two months after the Fifth Circuit's decision in *United States ex rel. Vavra*, and rests on facts similar to those of the instant case: the government asserted, among other claims, that KBR employees Terry Hall ("Hall") and Luther Holmes ("Holmes") accepted kickbacks from the vice president of a subcontractor under LOGCAP III. *Kellogg Brown & Root Servs., Inc.*, 728 F.3d at 1353. Following a bench trial, the district court concluded that an award under § 55(a)(1) was not warranted because "the KBR officials who accepted kickbacks were not sufficiently senior to warrant a finding of vicarious liability in this case," but awarded the government $38,000.000 under § 55(a)(2). *Id.* at 1368; *see Kellogg Brown & Root Servs., Inc. v. United States*, 103 Fed.Cl. 714, 776 (Fed.Cl.2012).

On appeal, the Federal Circuit agreed with the district court that § 55(a) "contemplates vicarious liability in both civil penalty provisions under subsections 1 and 2," and explained that "[t]he difference between § 55(a)(1) and § 55(a)(2) is the degree of knowledge that must be proven." *Kellogg Brown & Root Servs., Inc.*, 728

F.3d at 1368. The court then held that "an agent's knowledge is imputed to the principal when employees are acting with[in] the scope of their authority or employment, absent special circumstances"—circumstances that, the court found, did not apply. *Id.* at 1369–70. The court also noted that, under § 55(a)(1), "an employer (who does not know of kickbacks) can be liable for an employees's knowing acceptance of kickbacks." *Id.* at 1370 n.24. After rejecting KBR's assertion that "a different set of rules apply here because the AKA imposes punitive liability,"[8] the court reversed and remanded the case to the district court "with instructions to calculate damages consistent with the holding that KBR is liable for AKA violations under section 55(a)(1)." *Id.* at 1370. Significantly, the Federal Circuit did not remand for a determination of whether Hall and Holmes's knowledge could be imputed to KBR because "the trial court already found that [they] were acting 'as KBR employees and operating under LOGCAP III' when they accepted the kickbacks." *Id.* at 1370 n. 25; *see Kellogg Brown & Root Servs., Inc.*, 103 Fed.Cl. at 772.

Also similar to the Fifth Circuit case, the majority was a two-judge majority, with Judge Pauline Newman concurring in part and dissenting in part. *Kellogg Brown & Root Servs., Inc.*, 728 F.3d at 1372. Judge Newman argued that the double-penalty provision should not apply to KBR because "[t]here was no evidence that KBR 'received a benefit' from these bribes to its employees, . . . or had knowledge of the kickbacks at the time." *Id.* at 1373. The majority held, according to Judge Newman, that KBR was liable for the double-penalty despite the fact that "it appears undisputed that KBR did not have actual knowledge." *Id.* In doing so, Judge Newman asserted that her "colleagues have

removed the distinction between the two subsections of § 55(a), by imposing the double penalty provision of § 55(a)(1) in circumstances that invoke only the single strict liability provision of § 55(a)(2)." *Id.* at 1374.

### c. 1986 Amendments to the AKA

The AKA was amended in 1986 in order to "close loopholes in and broaden the coverage" of the AKA. S. REP. No. 99-435, at 2. Having found that the prior act "has limited civil recovery provisions," the amendments sought to expand civil liability in two ways: first, by "permitting civil recovery against anyone who violates the Act" under § 55(a)(2), including prime contractors who were exempted under the original act; and second, by "authorizing double damages and forfeitures in cases of knowing misconduct" under § 55(a)(1). *Id.* at 9, 14-15. Because the original act permitted recovery only against " 'the subcontractor or the recipient' of a kickback," prime contractors were not liable for kickback costs passed on to the government. *Id.* at 14. The prime contractors argued that they were properly exempted because they are often unknowing victims themselves of subcontract kickback fraud. *Id.* Yet, Congress rejected this argument, stating that "prime contractor employees are commonly key participants in the kickback schemes;" that prime contractors are "responsible for the actions of their employees" because they are "better situated than the Government to detect and prevent kickback schemes perpetrated by their employees and subcontractors;" and that the amendments "base[ ] the prime contractor's liability upon its own wrong action—charging the United States for the cost of illegal kickbacks," whether or not the prime contractor knows that the illegal

---

**8.** The court stated that the AKA is in fact not punitive, a conclusion that the Fifth Circuit

had previously reached, as well. *Id.* at 1370; *United States ex rel. Vavra*, 727 F.3d at 353.

kickback is included in its costs. *Id.* at 14-15.

Second, Congress found that by recovering a penalty equal to the amount of the kickback at issue, the government was not being fully compensated for its loss, which, in addition to the increased contract price, includes "the costs of detecting and investigating the kickbacks; the cost of kickbacks [the government] fails to discover; and ... other excess charges and performance problems caused by corrupt subcontractors." *Id.* at 16. The amendments to the AKA aimed to fix this problem by providing a provision that would authorize double damages plus a per-occurrence penalty "in cases where a person knowingly engages in prohibited conduct." *Id.* at 15. Originally, the bill increased the penalty to double damages for all cases, but Congress amended the provision, limiting it only to knowing violations, explaining:

> This change was made in response to claims by prime contractors that they often unknowingly pass on kickback costs resulting from misconduct between lower tier subcontractors, where no prime contractor employee was involved in the fraud. In such cases, the prime contractors believe it was unfair to hold them accountable for double damages and forfeitures, even where such damages were necessary to compensate the government. Recognizing that prime contractors can be unwitting participants in lower tier kickback schemes and that the provision for double damages and forfeitures represents a significant civil liability, the Committee agreed to restrict this type of recovery to cases of knowing violations.

*Id.* at 16-17. Senator Carl Levin further elaborated on the "knowing" element in the Senate floor debate, stating: "To meet the standard, the United States has to prove that the alleged wrongdoer was acting with awareness of what he or she was doing and not acting through mistake, inadvertence or mere negligence.... [I]t only has to show that the alleged wrongdoer made conscious decisions to act." 132 CONG. REC. 16,307 (1986).

### d. Knowledge Requirement of § 55(a)(1)

After considering each of these authorities, the court finds that in order for the government to prove that KBR knowingly engaged in conduct prohibited by section 53, it must show that Bennett was "acting within the scope of his authority and [that his] knowledge relates to matters within the scope of that authority." *In re Hellenic Inc.*, 252 F.3d 391, 395 (5th Cir.2001); *see also Kellogg Brown & Root Servs., Inc.*, 728 F.3d at 1369. The inquiry, however, does not stop there:

> While courts generally agree that the knowledge of directors or key officers, such as the president and vice president, is imputed to the corporation, they differ as to the effect of knowledge acquired by other employees. The decision on whether to impute knowledge acquired by such employees tends to be fact-intensive and contingent on the specific legal regimes involved.

*In re Hellenic Inc.*, 252 F.3d at 395; *see United States ex rel. Vavra*, 727 F.3d at 349 ("[D]efining what 'knowingly' entails in the context of the AKA is a nuanced, fact-reliant question unsuited for resolution at the motion to dismiss stage.") (citations omitted).

 Here, it is undisputed that Bennett did not serve as a vice president or president of KBR. Rather, he was KBR's Corporate Traffic Supervisor for LOGCAP III. Thus, it is not readily apparent from the record that Bennett's knowing AKA violation could be imputed to KBR. Furthermore, the government's assertion that the Fifth Circuit rejected a knowledge standard involving an inquiry into the em-

ployee's "authority, responsibility, or managerial role within the corporation" is ill-founded, as the Fifth Circuit explicitly stated in its opinion that it was not addressing the issue of knowledge. Although the Fifth Circuit rejected the requirement of a managerial role as a basis for vicarious liability, knowledge imputation is a distinct inquiry that requires such a finding. Because the government has not conclusively established that Bennett held a position at KBR for which his knowledge could be imputed to KBR, the government has failed to carry its burden on its motion for summary judgment.

## III. Conclusion

Based on the foregoing analysis, the government's Motion for Partial Summary Judgment (#130) is DENIED. The government fails to produce conclusive evidence to sustain its claims for forty violations of the AKA, and the government must proceed to trial on these claims.